FILED
United States Court of Appeals
Tenth Circuit

June 9, 2017

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JAMES DWIGHT PAVATT,

Petitioner-Appellant,

v.

No. 14-6117

TERRY ROYAL, Warden, Oklahoma
State Penitentiary,

Respondent-Appellee.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. 5:08-CV-00470-R)**

Sarah M. Jernigan, Assistant Federal Public Defender, Oklahoma City,
Oklahoma, (Patti Palmer Ghezzi, Assistant Federal Public Defender, Oklahoma
City, Oklahoma; and Robert R. Nigh, Jr., Tulsa, Oklahoma, with her on the
briefs), for Petitioner-Appellant.

Joshua L. Lockett, Assistant Attorney General, (E. Scott Pruitt, Attorney General
of Oklahoma, with him on the brief), Oklahoma City, Oklahoma, for Respondent-
Appellee.

Before **KELLY, BRISCOE** and **HARTZ**, Circuit Judges.

**HARTZ**, Circuit Judge.

James Pavatt was convicted by an Oklahoma jury of first-degree murder and conspiracy to commit first-degree murder. He was sentenced in accordance with the jury's recommendations to death on the first-degree-murder conviction and ten years' imprisonment on the conspiracy conviction. After exhausting his state-court remedies, he filed an application for relief under 28 U.S.C. § 2254. The district court denied the application, and also denied a certificate of appealability (COA). *See* 28 U.S.C. § 2253(c)(1) (requiring COA to appeal denial of relief under § 2254). Mr. Pavatt sought from this court and was granted a COA on several issues. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's denial of relief with respect to his conviction, but we reverse the denial of relief with respect to his sentence and remand to the district court for further proceedings.

## I.     FACTUAL BACKGROUND

The Oklahoma Court of Criminal Appeals (OCCA) summarized the crime:

> [Pavatt] and his co-defendant, Brenda Andrew, were each charged with conspiracy and first-degree capital murder following the shooting death of Brenda's husband, Robert ("Rob") Andrew, at the Andrews' Oklahoma City home on November 20, 2001. [Pavatt] met the Andrews while attending the same church, and [Pavatt] and Brenda taught a Sunday school class together. [Pavatt] socialized with the Andrews and their two young children in mid–2001, but eventually began having a sexual relationship with Brenda. Around the same time, [Pavatt], a life insurance agent, assisted Rob Andrew in setting up a life insurance policy worth approximately $800,000. [Pavatt] divorced his wife in the summer of 2001. In late September, Rob Andrew moved out of the family home, and Brenda Andrew initiated divorce proceedings a short time later.

2

Janna Larson, [Pavatt's] adult daughter, testified that in late October 2001, [Pavatt] told her that Brenda had asked him to murder Rob Andrew. On the night of October 25–26, 2001, someone severed the brake lines on Rob Andrew's automobile. The next morning, [Pavatt] and Brenda Andrew concocted a false "emergency," apparently in hopes that Rob would have a traffic accident in the process. [Pavatt] persuaded his daughter to call Rob Andrew from an untraceable phone and claim that Brenda was at a hospital in Norman, Oklahoma, and needed him immediately. An unknown male also called Rob that morning and made the same plea. Rob Andrew's cell phone records showed that one call came from a pay phone in Norman (near Larson's workplace), and the other from a pay phone in south Oklahoma City. The plan failed; Rob Andrew discovered the tampering to his car before placing himself in any danger. He then notified the police.

One contentious issue in the Andrews' divorce was control over the insurance policy on Rob Andrew's life. After his brake lines were severed, Rob Andrew inquired about removing Brenda as beneficiary of his life insurance policy. However, [Pavatt], who had set up the policy, learned of Rob's intentions and told Rob (falsely) that he had no control over the policy because Brenda was the owner. Rob Andrew spoke with [Pavatt's] supervisor, who assured him that he was still the record owner of the policy. Rob Andrew then related his suspicions about [Pavatt] and Brenda to the supervisor. When [Pavatt] learned of this, he became very angry and threatened to harm Rob for putting his job in jeopardy. At trial, the State presented evidence that in the months preceding the murder, [Pavatt] and Brenda actually attempted to transfer ownership of the insurance policy to Brenda without Rob Andrew's knowledge, by forging his signature to a change-of-ownership form and backdating it to March 2001.

On the evening of November 20, 2001, Rob Andrew drove to the family home to pick up his children for a scheduled visitation over the Thanksgiving holiday. He spoke with a friend on his cell phone as he waited in his car for Brenda to open the garage door. When she did, Rob ended the call and went inside to get his children. A short time later, neighbors heard gunshots. Brenda Andrew called 911 and reported that her husband had been shot. Emergency personnel arrived and found Rob Andrew's body on the floor of the garage; he had suffered extensive blood loss and they were unable to revive him. Brenda Andrew had also suffered a superficial gunshot

3

wound to her arm.  The Andrew children were not, in fact, packed and ready to leave when Rob Andrew arrived[1]; they were found in a bedroom, watching television with the volume turned up very high, oblivious to what had happened in the garage.

Brenda was taken to a local hospital for treatment.  Her behavior was described by several witnesses, experienced in dealing with people in traumatic situations, as uncharacteristically calm for a woman whose husband had just been gunned down.  One witness saw Brenda chatting giddily with [Pavatt] at the hospital later that night.

Rob Andrew was shot twice with a shotgun.  A spent shotgun shell found in the garage fit a 16–gauge shotgun, which is a rather unusual gauge.  Andrew owned a 16–gauge shotgun, but had told several friends that Brenda refused to let him take it from the home when they separated.  Rob Andrew's shotgun was missing from the home when police searched it.  One witness testified to seeing Brenda Andrew engaging in target practice at her family's rural Garfield County home about a week before the murder.  Several 16–gauge shotgun shells were found at the site.

Brenda told police that her husband was attacked in the garage by two armed, masked men, dressed in black, but gave few other details.  Brenda's superficial wound was caused by a .22–caliber bullet, apparently fired at close range, which was inconsistent with her claim that she was shot at some distance as she ran from the garage into the house.  About a week before the murder, [Pavatt] purchased a .22–caliber handgun from a local gun shop.  On the day of the murder, [Pavatt] borrowed his daughter's car and claimed he was going to have it serviced for her.  When he returned it the morning after the murder, the car had not been serviced, but his daughter found a .22–caliber bullet on the floorboard.  In a conversation later that day, [Pavatt] told Larson never to repeat that Brenda had asked him to kill Rob Andrew, and he threatened to kill Larson if she did.  He also told her to throw away the bullet she had found in her car.

---

[1]  In its opinion reviewing the conviction of Brenda Andrews, the OCCA corrected this statement.  There was not evidence that the bags were not packed.  *See* Order Denying Appellant's Motion for Rehearing, But Ordering That The Opinion Be Corrected (Okla. Crim. App. Sept. 11, 2017, at 3)

4

Police also searched the home of Dean Gigstad, the Andrews' next-door neighbor. There they found evidence that someone had entered the Gigstads' attic through an opening in a bedroom closet. A spent 16–gauge shotgun shell was found on the bedroom floor, and several .22–caliber bullets were found in the attic itself. There were no signs of forced entry into the Gigstads' home. Gigstad and his wife were out of town when the murder took place, but Brenda Andrew had a key to their home. The .22–caliber bullet found in Janna Larson's car was of the same brand as the three .22–caliber bullets found in the Gigstads' attic; the .22–caliber bullet fired at Brenda and retrieved from the Andrews' garage appeared consistent with them in several respects. These bullets were capable of being fired from the firearm that [Pavatt] purchased a few weeks before the murder; further testing was not possible because that gun was never found. The shotgun shell found in the Gigstads' home was of the same brand and odd gauge as the 16–gauge shell found in the Andrews' garage. Ballistics comparison showed similar markings, indicating that they could have been fired from the same weapon. Whether these shells were fired from the 16–gauge shotgun Rob Andrew had left at the home was impossible to confirm because, as noted, that gun also turned up missing.

In the days following the murder, [Pavatt] registered his daughter as a signatory on his checking account, and asked her to move his belongings out of his apartment. He obtained information over the Internet about Argentina, because he had heard that country had no extradition agreement with the United States. Larson also testified that after the murder, Brenda and [Pavatt] asked her to help them create a document, with the forged signature of Rob Andrew, granting permission for the Andrew children to travel with Brenda out of the country.

Brenda also asked Larson to transfer funds from her bank account to Larson's own account, so that Larson could wire them money after they left town. Brenda Andrew did not attend her husband's funeral. Instead, she and [Pavatt] drove to Mexico, and took the Andrew children with them. [Pavatt] called his daughter several times from Mexico and asked her to send them money. Larson cooperated with the FBI and local authorities in trying to track down [Pavatt] and Brenda. In late February 2002, having run out of money, [Pavatt] and Brenda Andrew re-entered the United States at the Mexican border. They were promptly placed under arrest.

5

*Pavatt v. State* (*Pavatt I*), 159 P.3d 272, 276–78 (Okla. Crim. App. 2007) (paragraph numbers and footnotes omitted).

On November 29, 2001, nine days after the murder, an information was filed in state court charging Mr. Pavatt and Brenda Andrew with first-degree murder. An amended information was filed on July 19, 2002, charging them with one count of first-degree murder and one count of conspiracy to commit first-degree murder. The prosecution also filed a bill of particulars alleging three aggravating circumstances for Mr. Pavatt: (1) that he committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration (the remuneration aggravator); (2) that the murder was especially heinous, atrocious, or cruel (the HAC aggravator); and (3) that he constituted a continuing threat to society.

Mr. Pavatt was tried separately from Ms. Andrew (who was also convicted on both counts and sentenced to death). His trial, which began on August 25, 2003, included a guilt phase followed by a sentencing phase. The jury found him guilty on both counts and found the remuneration and HAC aggravators. It also found that these aggravating circumstances outweighed the mitigating circumstances, and it recommended that Mr. Pavatt be sentenced to death on the first-degree-murder conviction.

Mr. Pavatt filed a direct appeal asserting 18 propositions of error. On May 8, 2007, the OCCA rejected Mr. Pavatt's arguments and affirmed his convictions

6

and sentences. *See Pavatt I*, 159 P.3d at 297. Mr. Pavatt's petition for rehearing was denied by the OCCA on June 26, and the United States Supreme Court denied his petition for a writ of certiorari on February 19, 2008. *See Pavatt v. Oklahoma*, 552 U.S. 1181 (2008).

On April 17, 2006, while his direct appeal was pending, Mr. Pavatt filed with the OCCA an application for postconviction relief asserting three propositions of error (one of which, ineffective assistance of appellate and trial counsel, included 23 subpropositions). On April 11, 2008, the OCCA issued an unpublished opinion denying the application. *See Pavatt v. State* (*Pavatt II*), No. PCD-2004-25 (Okla. Crim. App. Apr. 11, 2008).

Mr. Pavatt initiated his § 2254 proceedings on May 5, 2008, by filing a motion for appointment of counsel, which the district court granted. On April 1, 2009, his counsel filed a § 2254 application asserting 15 grounds for relief. The application conceded that some of the claims were "newly developed" and "m[ight] require further exhaustion." R. Vol. 3 at 335. For that reason, Mr. Pavatt requested that his application "be held in abeyance so that he [could] return to state court to accomplish any necessary exhaustion." *Id.* But the district court declined to stay the case or otherwise hold it in abeyance. Briefing in the case was completed on October 14, 2009, when Mr. Pavatt filed a reply brief in support of his application.

Meanwhile, on September 2, 2009, Mr. Pavatt filed with the OCCA a second application for postconviction relief asserting six propositions of error.

On February 2, 2010, the OCCA issued an unpublished opinion denying the application. *See Pavatt v. State* (*Pavatt III*), No. PCD-2009-777 (Okla. Crim. App. Feb. 2, 2010).

On May 1, 2014, the federal district court issued an order denying Mr. Pavatt's § 2254 application, entered final judgment in the case, and issued an order denying a COA with respect to all issues raised in the application.

Mr. Pavatt filed a notice of appeal on June 2, 2014. In a case-management order issued on November 24, 2014, we granted Mr. Pavatt a COA on the following issues:

A. [1] Whether there was sufficient evidence to support the "especially heinous, atrocious, or cruel" aggravator . . . and [2] whether the trial court's failure to provide an adequate instruction to the jury that it must find "conscious physical suffering" beyond a reasonable doubt before finding that the murder was "especially heinous, atrocious, or cruel" violated Mr. Pavatt's constitutional rights to a fair trial, a reliable sentencing determination, and due process . . .

B. Whether there was constitutionally ineffective assistance of trial counsel regarding the investigation of mitigating evidence or the presentation of a meaningful case for life imprisonment . . . [,] and whether appellate counsel was constitutionally ineffective in failing to raise a claim that trial counsel was ineffective in these regards; and

C. Whether trial counsel provided constitutionally ineffective assistance of counsel regarding the introduction of a camping video, live photographs of the victim, or testimony regarding the victim's good traits . . . and whether appellate counsel was constitutionally ineffective in failing to raise a claim that trial counsel was ineffective in these regards.

8

(Case Management Order, Nov. 24, 2014).  Because we reverse on issue A[1], we need not address issues A[2] and B.  We affirm on issue C.

## II.    STANDARD OF REVIEW

In a challenge to a state-court conviction under § 2254, "the appropriate standard of review depends upon whether a claim was decided on the merits in state court."  *Stouffer v. Trammell*, 738 F.3d 1205, 1213 (10th Cir. 2013) (citation omitted).  When, as here, the claims we must resolve on the merits were addressed on the merits, our standard of review is governed by 28 U.S.C. § 2254(d), which provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[A] state-court decision is contrary to [Supreme Court] precedent if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the [Supreme Court's]."  *Williams v. Taylor*, 529 U.S. 362,

9

405 (2000). "On the other hand, a run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Id.* at 406.

As for the "unreasonable application" clause of § 2254(d)(1), the Supreme Court has said, "A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision involving an unreasonable application of clearly established Federal law." *Id.* at 407–08 (brackets and ellipsis omitted) (internal quotation marks omitted). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. Notably, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410. Thus, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

## III. PAVATT'S CHALLENGES TO VERDICT OF GUILTY

Mr. Pavatt's sole challenge to his conviction is that his trial counsel was ineffective in failing to object to the admission of three categories of evidence allegedly designed to evoke sympathy for the victim, Rob Andrew: (1) a videotape showing Mr. Pavatt and Mr. Andrew on a hunting trip, (2) "glowing accounts" of Mr. Andrew

10

from his friends and family, and (3) four photographs of him taken before his death. Aplt. Br. at 49. The first two claims are procedurally barred, and the third lacks merit.

The claim of inadequate assistance with respect to the first two categories of evidence was not adequately raised in federal district court. The only challenge at all related to category 1 in Mr. Pavatt's amended petition under § 2254 was headed: "Counsel Failed to Object to the Admission of Live Photographs of Rob Andrew." App., Vol. 3 at 317. But that section of the 216-page petition (which served as the brief in support) does not claim ineffective assistance with respect to the video. Indeed, it begins with the sentence, "Trial counsel objected to the admission of the video recording of the hunting trip." *Id.* In this court Mr. Pavatt argues that the trial objection to the video was inadequate; but that claim was not made below.

As for category 2, one sentence in the "Live Photographs" section of the petition states, "A review of his conduct further reveals that trial counsel allowed multiple witnesses, who were friends and family of Rob Andrew, to testify to entirely irrelevant matters that could only raise sympathy in the minds of jurors. *See* Grounds 2, 7, *infra*." *Id.* at 318.[2] But this one sentence, which is not developed further, and which is buried in a section whose heading does not encompass the point, does not adequately preserve this

---

[2] Ground 2 of the petition is a Confrontation Clause challenge to alleged hearsay introduced at trial; the word *sympathy* does not appear in the petition's discussion of that ground. Ground 7 addresses alleged prosecutorial misconduct. The petition contains a section under that ground entitled "First Stage Victim Sympathy," but it does not say anything about what, if any, sympathy evidence was objected to by trial counsel. *Id.* at 224.

11

ineffectiveness issue.  The district court, not perceiving it as an issue, did not address it in the 112-page opinion denying relief.

Thus, the only ineffectiveness claim relating to the guilt phase of the trial that was preserved in federal district court is that trial counsel did not adequately object to the admission of the photographs (and that appellate counsel did not raise on appeal this deficiency of trial counsel).  Mr. Pavatt has not argued that admission of this evidence during the guilt phase violated any federal constitutional right.  The alleged ineffectiveness was only counsel's failure to argue that the evidence should have been excluded under Oklahoma law.  This ineffectiveness challenge clearly fails with respect to one of the pictures (State's Exhibit 219).  In his first state postconviction petition, Mr. Pavatt argued that his trial and appellate counsel should have objected to the admission of the exhibit.  But the OCCA rejected the argument, holding that the claim was barred by res judicata and noting that it had sustained the admissibility of a similar photograph in a prior case.  *See Pavatt II,* No. PCD-2004-25 at 6 n.6.  A claim of ineffective assistance of counsel for failure to object to evidence cannot be sustained if the objection was doomed to fail.  *See Williams v. Trammell,* 782 F.3d 1184, 1198 (10th Cir. 2015).

That leaves only a challenge to the failure to object to three other photographs taken of Mr. Andrew during his life.  But even if competent counsel should have objected to the evidence, Mr. Pavatt's ineffectiveness claim fails for lack of prejudice.  To prevail on such a claim, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [guilt phase] would have been different." *Id.* at 1197–98 (internal quotation marks omitted).  We are at a total loss to see how, in

12

light of the compelling evidence of guilt, the three photographs could have been a significant factor in the verdict; and Mr. Pavatt offers no argument in support. We therefore reject this portion of the claim on the merits.

## IV. "HEINOUS, ATROCIOUS, OR CRUEL" (HAC) AGGRAVATOR

At the conclusion of the second-stage proceedings the jury found the murder to be "especially heinous, atrocious, or cruel." [3] The jury instruction on the HAC aggravating circumstance defined the terms as follows:

> As used in these instructions, the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.
>
> The phrase "especially heinous, atrocious, or cruel" is directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse.

R. Vol. 1 at 188. According to Mr. Pavatt, the evidence presented at his trial was "constitutionally insufficient" to establish the HAC aggravator, Aplt. Br. at 21, and the OCCA's determination to the contrary was "contrary to or an unreasonable application of Supreme Court law," *id*. at 36.

"To assess the sufficiency of the evidence, we first determine the elements of the offense and then examine whether the evidence suffices to establish each element." *Anderson-Bey v. Zavaras*, 641 F.3d 445, 448 (10th Cir. 2011). Due process requires that the evidence presented at trial, viewed in the light most favorable to the prosecution, be

---

[3] The jury also found the remuneration aggravator. The parties have not presented arguments on what effect that has on the disposition of this case. We leave the matter to the district court on remand.

sufficient to allow a "rational trier of fact [to] have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In a capital case the aggravating factors necessary for imposition of the death penalty "operate as the functional equivalent of an element of a greater offense." *Ring v. Arizona*, 536 U.S. 584, 609 (2002) (internal quotation marks omitted).

The elements of a state offense are ordinarily purely a matter of state law. In reviewing a state conviction under § 2254, we do not second guess whether the state courts have correctly interpreted their law. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). But States do not have a totally free hand in deciding how to define their aggravating circumstances for capital cases. The United States Constitution sets some limits. Since the Supreme Court held in *Furman v. Georgia*, 408 U.S. 238 (1972), that then-current capital-sentencing procedures were unconstitutional, the underlying principle guiding Supreme Court doctrine has been that "the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be . . . wantonly and . . . freakishly imposed." *Lewis v. Jeffers*, 497 U.S. 764, 774 (1990) (brackets, ellipsis, and internal quotation marks omitted). To prevent that intolerable result, discretion in imposing the death penalty "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id.* (internal quotation marks omitted). The State must "channel the sentencer's discretion by clear and objective standards that

14

provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." *Id.* (internal quotation marks omitted).

Thus, a defendant challenging the sufficiency of the evidence to support a capital aggravator may, as Mr. Pavatt does here, raise both a *Jackson* challenge to the sufficiency of the evidence to establish the aggravator as defined by state law and an Eighth Amendment challenge to the constitutionality of the aggravator as so defined. Our focus is on the Eighth Amendment challenge. This requires a thorough review of Supreme Court precedent regarding how federal courts are required to examine a State's aggravating circumstances to see if they pass muster.

We start with *Gregg v. Georgia*, 428 U.S. 153 (1976), where the Supreme Court considered Georgia's outrageously-or-wantonly-vile aggravator, which included any murder that was "'outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim,'" *id.* at 210 (White, J., concurring) (quoting Georgia statute). The prevailing plurality stated that it was "arguable that any murder involves depravity of mind or an aggravated battery." *Id.* at 201 (joint opinion of Justices Stewart, Powell, and Stevens). But, in the view of those Justices, the aggravator's "language need not be construed in this way," and they would not invalidate the aggravator because "there [was] no reason to assume that the Supreme Court of Georgia [would] adopt such an open-ended construction." *Id.*; *see Lewis*, 497 U.S. at 775 (construing this as the holding in *Gregg*).

Later, however, in *Godfrey v. Georgia*, 446 U.S. 420 (1980), the Court took another look at the State's application of the aggravator. The prevailing plurality (two

15

other Justices would have set aside the death sentence on broader grounds) framed the

issue before the court as "whether, in affirming the imposition of the sentences of death

in the present case, the Georgia Supreme Court has adopted such a broad and vague

construction of the [pertinent] aggravating circumstance as to violate the Eighth and

Fourteenth Amendments to the United States Constitution." *Id.* at 423. Godfrey

murdered his wife and mother-in-law after his wife, who had moved in with her mother,

had ended a telephone conversation by telling him that reconciliation would be

impossible. The Court described the facts of the murder as follows:

> At this juncture, the petitioner got out his shotgun and walked with it
> down the hill from his home to the trailer where his mother-in-law lived.
> Peering through a window, he observed his wife, his mother-in-law, and his
> 11-year-old daughter playing a card game. He pointed the shotgun at his
> wife through the window and pulled the trigger. The charge from the gun
> struck his wife in the forehead and killed her instantly. He proceeded into
> the trailer, striking and injuring his fleeing daughter with the barrel of the
> gun. He then fired the gun at his mother-in-law, striking her in the head
> and killing her instantly.

*Id.* at 425.[4] The Georgia Supreme Court rejected Godfrey's challenge to the aggravator

as unconstitutionally vague, noting its prior rejection of such challenges and stating that

---

[4] Justice White's dissent also described Godfrey's murder of his mother-in-law: "[After Godfrey killed his wife with a shotgun blast that left a hole in her head the size of a silver dollar,] he took out time not only to strike his daughter on the head, but also to reload his single-shot shotgun and to enter the house. Only then did he get around to shooting his mother-in-law, . . . whose last several moments as a sentient being must have been as terrifying as the human mind can imagine." 446 U.S. at 449 (White, J., dissenting). He continued, "[W]ho among us can honestly say that [the mother-in-law] did not feel 'torture' in her last sentient moments. . . . What terror must have run through her veins as she first witnessed her daughter's hideous demise and then came to terms with the imminence of her own." *Id.* at 449–50.

16

the evidence supported the jury's finding of the aggravating circumstances. *See id.* at 427.

The United States Supreme Court reversed. Although it acknowledged that in prior cases the Georgia Supreme Court had applied constitutionally valid narrowing constructions of the aggravator, it said that there was no evidence that the Georgia court had applied a narrowing construction in that case. *See id.* at 429–32; *Lewis*, 497 U.S. at 775 (paraphrasing *Godfrey*). In particular, the state court had upheld the death sentence even though, in contrast to prior cases in which the sentence had been upheld, there was no claim of torture and no evidence that the defendant had "committed an aggravated battery upon [either victim] or, in fact, caused either of them to suffer any physical injury preceding their deaths." 446 U.S. at 432. The prevailing plurality said that there was "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." 446 U.S. at 433; *see also id.* at 428–29 ("a person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.'")

The Supreme Court's standard was succinctly stated in *Zant v. Stevens*, 462 U.S. 862, 877 (1983): "[A]n aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder"; *see also Lewis*, 497 U.S. at 776 ("aggravating circumstances must be construed to permit the sentencer to make a principled distinction between those who deserve the death penalty and those who do not"). The Court held that the two aggravating circumstances in that

17

case (the defendant had escaped from lawful confinement and had a prior conviction for a capital felony) "adequately differentiate this case in an objective, evenhanded, and substantively rational way from the many Georgia murder cases in which the death penalty may not be imposed." 462 U.S. at 879.

Of particular significance to this appeal is *Maynard v. Cartwright*, 486 U.S. 356, 359 (1988), affirming *Cartwright v. Maynard*, 822 F.2d 1477 (10th Cir. 1987) (en banc), which considered Oklahoma's HAC aggravator. The operative language of the aggravator was the same as for this case—"especially heinous, atrocious, or cruel." And the jury had been instructed that "'the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.'" *Cartwright*, 822 F.2d at 1488. The Supreme Court said that in applying the aggravator, the OCCA "simply had reviewed all the circumstances of the murder and decided whether the facts made out the aggravating circumstance." 486 U.S. at 360. It held that the OCCA's approach did not satisfy the Eighth Amendment (1) because the statutory language "fail[ed] adequately to inform juries what they must find to impose the death penalty and as a result [left] them and appellate courts with the kind of open-ended discretion which [had been] held invalid in [*Furman*]," 486 U.S. at 361–62, and (2) because the OCCA had not construed the HAC aggravator in a manner sufficient "to cure the unfettered discretion of the jury and to satisfy the commands of the Eighth Amendment," *id.* at 364. "Court precedents," it said, "have insisted that the channeling and limiting of the sentencer's discretion in imposing the death sentence is a

18

fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action." *Id.* at 362. The Court compared the language of the Oklahoma aggravator to the "outrageously or wantonly vile, horrible and inhuman" language considered in *Godfrey*, where the Court had said: "There is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence. A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.'" *Id.* at 363 (internal quotation marks omitted). The vague language of the aggravator resulted in there being "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." *Id.* (internal quotation marks omitted). The Court further rejected "[t]he State's contention that the addition of the word 'especially' somehow guides the jury's discretion, even if the term 'heinous' does not." *Id.* at 364. The contention was "untenable" because "[t]o say that something is 'especially heinous' merely suggests that the individual jurors should determine that the murder is more than just 'heinous,' whatever that means, and an ordinary person could honestly believe that every unjustified, intentional taking of human life is 'especially heinous.'" *Id.* The Court indicated, however, that Oklahoma could cure the problem by providing a limiting construction of the statutory language. It mentioned that this court had noted cases stating that imposing a requirement of torture or serious physical abuse is adequate but the Court left open the possibility that other limiting instructions could also suffice. *See id.* at 364–65.

19

In response to this court's *Cartwright* opinion, the OCCA narrowed its construction of the HAC aggravator. It required that "the murder of the victim [be] preceded by torture or serious physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty." *Cheney v. State*, 909 P.2d 74, 80 (Okla. Crim. App. 1995); *see Medlock v. Ward*, 200 F.3d 1314, 1324 (10th Cir. 2000) (Lucero, J., concurring) (summarizing Oklahoma law). "Absent evidence of conscious physical suffering of the victim prior to death, the required torture or serious physical abuse standard is not met." *Cheney*, 909 P.2d at 80 (internal quotation marks omitted). As for extreme mental cruelty, "torture creating extreme mental distress must be the result of intentional acts by the defendant" and "must produce mental anguish in addition to that which of necessity accompanies the underlying killing." *Id*.

Consequently, the HAC aggravator "contemplates a two-step analysis." *Nuckols v. State*, 805 P.2d 672, 674 (Okla. Crim. App. 1991). The first step requires the jury to determine whether the "death of the victim was preceded by torture or serious physical abuse." *Id.* (internal quotation marks omitted). "Once this foundational assessment is made, . . . the jury may apply the definitions given to them . . . to measure whether or not the crime can be considered to have been heinous, atrocious or cruel." *Id.*

This two-step analysis is reflected in the uniform jury instruction set forth in *DeRosa v. State*, 89 P.3d 1124 (Okla. Crim. App. 2004), decided after

20

Mr. Pavatt's trial. The instruction—to "be used in all future capital murder

trials" in which the HAC aggravator is alleged—states:

> The State has alleged that the murder was "especially heinous, atrocious, or cruel." This aggravating circumstance is not established unless the State proves beyond a reasonable doubt:
>
>> *First,* that the murder was preceded by either torture of the victim or serious physical abuse of the victim; and
>>
>> *Second,* that the facts and circumstances of this case establish that the murder was heinous, atrocious, or cruel.
>
> You are instructed that the term "torture" means the infliction of either great physical anguish or extreme mental cruelty. You are further instructed that *you cannot find that "serious physical abuse" or "great physical anguish" occurred unless you also find that the victim experienced conscious physical suffering prior to his/her death.*
>
> In addition, you are instructed that the term "heinous" means extremely wicked or shockingly evil; the term "atrocious" means outrageously wicked and vile; and the term "cruel" means pitiless, designed to inflict a high degree of pain, or utter indifference to or enjoyment of the suffering of others.

*Id.* at 1156. "This instruction [did] not change any of the legal requirements of

the 'heinous, atrocious, or cruel' aggravating circumstance as it ha[d] existed up

until [that] time." *Id.* Its purpose was "to more fully inform the jury regarding

the findings that must be made in order to properly apply the aggravator and to

ensure that a jury determination is made regarding each of these findings." *Id.*

In short, the OCCA has confined the HAC aggravator, in the absence of

extreme mental cruelty, to murders in which "the victim experiences conscious

physical suffering" before death. This court has responded favorably. We first

21

approved the *Cheney* narrowing construction in *Hatch v. State of Oklahoma*, 58

F.3d 1447, 1468–69 (10th Cir. 1995).  In further holding that the trial judge

properly applied the enhancement, we quoted the following from the judge's

remarks at the sentencing proceeding:

> When the law talks of torturing people, that doesn't mean you have
> to put them on the rack or twist their arms or something.  I can't
> think of anymore [sic] torture than to tie a man and a woman up,
> hog-tie them where they can't move and at the same time while
> they're laying there waiting to be shot, they listen to their twelve-
> year-old daughter crying and pleading not to be raped by two grown
> men.

*Id*. at 1469.  We said that the judge "found the necessary facts to indicate that the

crime involved torture or physical abuse."  *Id.*

We repeated our endorsement of the narrowing construction in *Medlock v.*

*Ward,* 200 F.3d 1314, 1321 (10th Cir. 2000), stating:  "We have held that the

'heinous, atrocious, or cruel' aggravating circumstance as narrowed by the

Oklahoma courts after *Maynard* to require torture or serious physical abuse

characterized by conscious suffering can provide a principled narrowing of the

class of those eligible for death."  And we concluded that the defendant in that

case had "fail[ed] to demonstrate that Oklahoma ha[d] applied its narrowing

construction in an unconstitutional manner."  *Id.*  In support of that conclusion,

we set forth the following evidence:

> [The defendant] repeatedly grabbed his victim by the arm, wrestled
> with her, struck her in the face, threw her onto his bed, and covered her
> mouth when she began screaming.  He choked her until she temporarily
> passed out, then dragged her to the toilet and stuck her head into the bowl
> while she was conscious and gasping for air, keeping her there for ten

22

> minutes until she passed out again. When he noticed she was still breathing and alive, he used a steak knife to stab her in the back of the neck and, when that knife bent, took a hunting knife and stabbed her in the back of the neck again until she died.

*Id*. at 1322 (citations omitted); *see also Duvall v. Reynolds*, 139 F.3d 768, 792–94 (10th Cir. 1998) (after defendant stabbed the victim more than 25 times on her head, chest, abdomen, and back, the victim asked for help, and he responded, "Well . . . , it's just too late for that," before proceeding to suffocate her with a pillow).

But our prior opinions are not an open-ended endorsement of any possible interpretation or application of the narrowing construction. On the contrary, in 2000, although reversing a death penalty based on the HAC aggravator for lack of evidence, we said that "we would be remiss if we failed to note" that Oklahoma's construction of the HAC aggravator in that case "appears to raise serious constitutional questions about whether [the] aggravator legitimately narrows the class of those eligible for death." *Thomas v. Gibson*, 218 F.3d 1213, 1228 n.17 (10th Cir. 2000). The following year we expressed a more general concern about Oklahoma's construction of the aggravator. We wrote:

> Recent Oklahoma cases . . . have begun to blur the common understanding of the requisite torture and conscious serious physical suffering, more and more often finding the existence of [the HAC] elements in almost every murder. . . . There is certainly a concern that Oklahoma's interpretation of its narrowing language could again render this aggravating factor unconstitutional. *See Thomas*, 218 F.3d at 1228 & n. 17; *see also Medlock*, 200 F.3d at 1324 (Lucero, J., concurring) (noting that if Oklahoma permitted capital sentencers to find the [HAC] aggravator, based merely on the brief period of conscious suffering necessarily present in virtually all murders it would fail to narrow the sentencer's discretion, as constitutionally required [by] *Godfrey*).

23

*Romano v. Gibson*, 239 F.3d 1156, 1176 (10th Cir. 2001) (original brackets and internal quotation marks omitted).

With this background, we turn to the case before us. The State agrees that it had to prove that Mr. Andrew experienced conscious physical suffering. But the supporting evidence is slim. The State points to three items of evidence. First, the testimony of the medical examiner. All he said, however, was that it was *possible* (he did not testify that it was *probable*) that Mr. Andrew could have been conscious for a time after the shooting; regarding pain, he said only that Mr. Andrew could have experienced pain while dying. *See* Tr. at 2457–67. Second, the conversation between Mrs. Andrew and the 911 operator. While reciting her fabricated account of the murder, Mrs. Andrew, prompted by the operator, said that Mr. Andrew was still breathing and trying to talk to her. (She did not mention any sign of suffering or pain.) Finally, Mr. Andrew's body was found holding a plastic bag of cans, which, in the OCCA's view, "reasonably suggested that he either tried to ward off his attacker or shield himself from being shot." *Pavatt I*, 159 P.3d at 294.

Perhaps a reasonable juror could have found this to be sufficient evidence of conscious physical suffering (although we note that the jury was never instructed that it needed to make that finding). But this is not the sort of suffering that could in a "principled way . . . distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." *Godfrey*, 446 U.S. at 433. To repeat what Judge Lucero stated in his concurrence in *Medlock*,

24

> Under the Eighth Amendment, applying the narrowing construction of the aggravating circumstance in a manner that permitted Oklahoma courts to find 'torture or serious physical abuse' based merely on the brief period of conscious suffering necessarily present in virtually all murders would fail to narrow the sentencer's discretion as required by [*Godfrey*] and [*Maynard*], leaving the sentencer "with the kind of open-ended discretion which was held invalid in [*Furman*]."

200 F.3d at 1324 (Lucero, J., concurring) (quoting *Maynard*, 486 U.S. at 361–62).

Indeed, the OCCA apparently recognized as much in one context, stating that "[t]he torture must produce mental anguish in addition to that which of necessity accompanies the underlying killing." *Cheney*, 909 P.2d at 80. For example, in *Cudjo v. State*, 925 P.2d 895, 901 (OCCA 1996), the victim "did experience some conscious physical or mental suffering prior to his death," but the court nevertheless held that "the evidence fails to demonstrate that his murder was preceded by torture or serious physical abuse."

Thus, we have a case controlled by the Supreme Court's holding in *Godfrey*. The State has an aggravator that at one time it had been construing in a constitutionally acceptable manner. But, as in *Godfrey*, that does not immunize its decisions from review of whether it has departed from that acceptable construction. Mr. Pavatt has challenged "whether there was sufficient evidence to support a constitutional reading and application of the [HAC aggravator]." Reply Br. at 5; *see* Aplt. Br. at 21 ("the evidence here—as related to the core element of conscious suffering—is constitutionally insufficient"); *id.* at 35–36 ("The Eighth and Fourteenth Amendments require that an aggravator serve a narrowing function rather than become a standardless catch-all. *Arave v. Creech,* 507 U.S. 463, 474 (1993) and *Godfrey*. . . . Oklahoma has veered off the course forced on it by *Cartwright*, coming full circle and no longer limiting this clearly vague aggravating

25

circumstance in a manner that minimizes 'the risk of wholly arbitrary and capricious action.' *Maynard*, 486 U.S. at 362–63."). We hold that this Eighth Amendment challenge is meritorious.[5]

*Maynard* and other Supreme Court precedents have held that the Oklahoma HAC aggravator would not be constitutional absent a narrowing construction that would distinguish in a principled manner those cases meriting the death penalty under the aggravator from the many cases in which it was not imposed. *See* 486 U.S. at 363. And *Godfrey* established that even when a State has previously applied a constitutionally valid narrowing construction of an aggravator, a death penalty imposed under the aggravator must still be based on a construction that in a "principled way" can distinguish the case from the many in which the penalty was not imposed. 446 U.S. at 433. This case illustrates that the OCCA no longer construes "conscious physical suffering" so that it distinguishes in a principled way between crimes deserving death and the many cases in which the death penalty is not imposed. Virtually any murder in which the victim did not

---

[5] The dissent appears to contend that the Eighth Amendment component of Mr. Pavatt's sufficiency-of-the-evidence claim is procedurally barred because it was inadequately briefed in his direct appeal to the OCCA. But we decline to sua sponte address the issue of procedural bar. In district court the State said that Mr. Pavatt's Ground Ten had been "exhausted for purposes of federal habeas review." Response to Petition for Writ of Habeas Corpus at 128. In its response to that ground the State included substantial references to the Eighth Amendment constraints on aggravators. And although the State's brief on appeal argued procedural bar with respect to several of Mr. Pavatt's claims, it did not argue in its appellate brief that the sufficiency-of-the-evidence claim or any of its components was procedurally barred, nor did it argue procedural bar when questioned at oral argument about the insufficient-narrowing component of that claim. Likewise, the State has not objected to the Eighth Amendment component of Mr. Pavatt's sufficiency-of-the-evidence claim on the ground that our grant of COA did not encompass the issue. Of course, our opinion implicitly (and now explicitly) grants a COA if such a grant is necessary.

die instantly could qualify for the enhancement as presently construed if there is a possibility that the act of murder did not immediately render the victim unconscious and the wounds could have caused pain. The State has not offered any reason to believe, or even bothered to argue, that "the brief period of conscious suffering necessarily present in virtually all murders," *Medlock*, 200 F.3d at 1324 (Lucero, J., concurring), could provide a "principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not," *Maynard*, 486 U.S. at 363. Even if, though we doubt, many murder victims do not experience even a brief period of conscious physical suffering between the time of the fatal blow and death, that possibility would so often be purely a matter of chance that we think it is not a principled way to determine who should suffer the penalty of death and who should not. (Of course, the murderer's intent to cause such suffering would be another matter altogether.) Thus, the OCCA did not apply a constitutionally acceptable interpretation of Oklahoma's HAC aggravator in determining that the aggravator was supported by sufficient evidence.

An important point requires emphasis. We are not saying that the OCCA in this case unconstitutionally applied a constitutionally acceptable narrowing construction of the State's HAC aggravator. We are saying that it did not apply the narrowing construction that we previously approved. By expanding the meaning of "conscious physical suffering" to encompass "the brief period of conscious suffering necessarily present in virtually all murders," *Medlock,* 200 F.3d at 1324 (Lucero, J., concurring)—as it did in this case—Oklahoma has construed the HAC aggravator in a constitutionally impermissible manner. *Lewis* distinguished *Godfrey* on the ground that "[u]nlike in

27

*Godfrey,* there is no dispute in this case that the Arizona Supreme Court applied its narrowing construction of Arizona's . . . aggravating circumstance to the facts of respondent's case." 497 U.S. at 776–77. In this case, however, there is such a dispute, and it is the heart of the matter. We are unwilling to hold that once we have held that an aggravator has been or could be constitutionally construed, we cannot revisit the issue after it is clear that the state court has not adopted a constitutionally acceptable construction. That is the lesson of *Godfrey,* and *Lewis* did not reject that lesson.

We recognize that our standard of review in this appeal is established by AEDPA. We can grant relief "with respect to [a] claim that was adjudicated on the merits in State court proceedings," only if that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Here, however, the decision of the OCCA failed to pass muster under this provision. To properly decide whether there was sufficient evidence to sustain the aggravator, the court needed to determine that the evidence would support a finding of *conscious physical suffering* under a definition of that term that satisfied both Oklahoma law and the Eighth Amendment. Although it could certainly determine how *conscious physical suffering* should be defined under Oklahoma law and (we will assume) it properly concluded that the evidence at trial satisfied that definition, it totally failed to consider the other component of the analysis—whether the definition it applied satisfies the Eighth Amendment. As Mr. Pavatt puts it, the OCCA did not address "whether there was

28

sufficient evidence to support a constitutional reading and application of the [HAC] aggravator." Reply Br. at 5.

As we understand recent Supreme Court authority, the OCCA's rejection of Mr. Pavatt's sufficiency-of-the-evidence claim without applying or even considering controlling Supreme Court precedent (or at least engaging in an equivalent analysis even if not citing Supreme Court precedent) rendered its decision contrary to clearly established federal law. In *Lafler v. Cooper*, 566 U.S. 156 (2012), the Court reviewed a decision of the Michigan appellate court denying the defendant's ineffective-assistance-of-counsel claim based on counsel's alleged incompetence in advising him to reject a prosecution plea offer. The defendant proceeded to trial and ultimately received a sentence much harsher than what had been offered. *See id.* at 161. The Court applied the two-part test for ineffective assistance set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires the defendant to establish deficient performance and prejudice from that deficiency. *See Lafler*, 566 U.S. at 162–63. Because there was no dispute that counsel's performance was deficient, "[t]he question for [the] Court [was] how to apply Strickland's prejudice test where ineffective assistance results in a rejection of the plea offer and the defendant is convicted at the ensuing trial." *Id.* at 163. This was a new issue for the Court. It had "never held that a defendant in [that] position can establish *Strickland* prejudice." *Id.* at 183 (Scalia, J., dissenting); *see Williams v. Jones*, 571 F.3d 1086, 1097–1101 (10th Cir 2009) (Gorsuch, J., dissenting) (arguing, in same circumstances, that defendant suffered no prejudice to a constitutional interest, given that

29

he received a fair trial).  But "AEDPA [did] not present a bar to granting [the defendant]

relief."  566 U.S. at 173.  The Court explained:

> That is because the [state court] identified [the defendant's] ineffective-assistance-of-counsel claim but failed to apply *Strickland* to assess it.  Rather than applying *Strickland*, the state court simply found that [the defendant's] rejection of the plea was knowing and voluntary.  An inquiry into whether the rejection of a plea is knowing and voluntary, however, is not the correct means by which to address a claim of ineffective assistance of counsel. . . . *By failing to apply Strickland to assess the ineffective-assistance-of-counsel claim [the defendant] raised, the state court's adjudication was contrary to clearly established federal law*.

*Id*. (citations omitted) (emphasis added).

Likewise, in this case the OCCA's adjudication was "contrary to clearly

established federal law" because its analysis did not discuss, apply, or even cite the

Supreme Court decisions governing the constitutional requirements limiting death-

penalty aggravators.  The opinion did not address at all whether the evidence presented

was sufficient to support a *constitutionally acceptable* HAC aggravator.[6]  Therefore,

"AEDPA does not present a bar to granting [Mr. Pavatt] relief."  *Id.*  "[I]n [this]

circumstance, the federal courts in this habeas action can determine the principles

necessary to grant relief."  *Id.* This we have done.  Applying Supreme Court precedent,

we hold that the HAC aggravator cannot constitutionally be applied in this case.

In following *Lafler* we are not proceeding contrary to *Harrington v. Richter,* 562

U.S. 86 (2011).  That opinion held that "§ 2254(d) applies when a state court's order is

---

[6]  Moreover, upholding the OCCA's construction of *conscious physical suffering* in this case as satisfying constitutional standards would be an "unreasonable application" of Supreme Court decisions.  28 U.S.C. § 2254(d)(1).  The Supreme Court's oft-applied principles governing aggravators that have been set forth above compels our conclusion in this case.

30

unaccompanied by an opinion explaining the reasons relief has been denied." *Id.* at 98.

It did not say that when the state court provides some reasons why a claim for relief has

been denied, we should presume that it also had additional, more persuasive, reasons.

The author of *Lafler,* who had written the Court's opinion in *Richter* a year earlier, did

not speculate that the lower court had silently applied *Strickland* in denying relief.  And

there was much stronger reason to assume that the lower court in *Lafler* had silently

applied *Strickland* than there is to believe that the OCCA in this case considered Eighth

Amendment constraints on its construction of the HAC aggravator.  As the dissent in

*Lafler* pointed out, the state court in that case had recited the requirements of *Strickland*

in the paragraph preceding the one relied on by the majority in concluding that the state

court had not *applied* those requirements.  *Lafler*, 566 U.S. at 182–83 (Scalia, J.,

dissenting).  In our case, the OCCA resolved Mr. Pavatt's sufficiency-of-the-evidence

issue without any mention of the Eighth Amendment or its principles.

## V.     CONCLUSION

We **AFFIRM** the judgment of the district court regarding Mr. Pavatt's

conviction but **REVERSE** and **REMAND** with respect to his sentence.  We

**DENY** Mr. Pavatt's request for an additional COA.

31

**No. 14-6117, <u>Pavatt v. Royal</u>**

**BRISCOE**, Circuit Judge, concurring in part and dissenting in part.

I concur in part and dissent in part. I agree with Part III of the majority's opinion, which rejects certain of Pavatt's ineffective assistance of counsel claims and affirms the denial of federal habeas relief on Pavatt's convictions for first degree murder and conspiracy to commit first degree murder. As I explain in greater detail below, however, I would add that there is no merit to any of Pavatt's ineffective assistance claims, or to his additional argument urging us to recognize an exception to the procedural bar that applies to most of his ineffective assistance of counsel claims.

As for Part IV of the majority's opinion, I disagree with it in full. As I shall discuss in greater detail below, Pavatt's appellate brief in this case attempts to assert three distinct challenges to the jury's second-stage finding that the murder was especially heinous, atrocious or cruel (the HAC aggravating circumstance): (1) that the jury was not properly instructed regarding the HAC aggravating circumstance; (2) that the evidence presented at his sentencing proceeding was constitutionally insufficient to support the HAC aggravating circumstance; and (3) that the HAC aggravator, as applied in his case, is unconstitutionally vague in violation of the Eighth Amendment. Part IV of the majority's opinion only briefly touches on and does not ultimately resolve the first and0 second of these issues. Instead, Part IV focuses on and ultimately grants federal habeas relief on the basis of the Eighth Amendment claim. In doing so, however, Part IV ignores the undisputed fact that the Eighth Amendment claim is unexhausted because Pavatt never presented it to the OCCA. Part IV also ignores the undisputed fact that this court

never granted Pavatt a certificate of appealability (COA) as to the Eighth Amendment claim. In short, Part IV grants Pavatt federal habeas relief on the basis of a claim that was never presented to or decided by the OCCA and that is not properly before this court.

Thus, in sum, I would affirm the judgment of the district court denying Pavatt's petition for writ of habeas corpus in its entirety.

I

Pavatt asserts a number of claims of ineffective assistance of counsel and appellate counsel, including the claims of ineffective assistance of trial counsel that are addressed and rejected in Part III of the majority opinion. Although I agree with the majority that Pavatt is not entitled to federal habeas relief on the basis of these claims, I would conclude that only one of Pavatt's ineffective assistance claims is properly before us, and that the remainder are procedurally barred due to Pavatt's failure to present them to the OCCA "in compliance with relevant state procedural rules." Cone v. Bell, 556 U.S. 449, 465 (2009).

In his original application for state post-conviction relief, Pavatt asserted a host of claims alleging ineffective assistance of trial and appellate counsel. Only one of those claims, however, is now at issue in this appeal. That was a claim that his appellate attorneys failed to challenge on direct appeal the admissibility of a photograph of Rob Andrew taken prior to his death (State's Exhibit 219), and that the admission of that photograph "rendered . . . Pavatt's trial fundamentally unfair, depriving him of the Due Process of Law, and unconstitutionally injected passion, prejudice, and other arbitrary

2

factors into the sentencing proceeding." Original App. for Post-Conviction Relief at 54 (citations omitted). The OCCA denied relief on the claim, noting in part that it had rejected a similar claim in Marquez-Burrola v. State, 157 P.3d 749, 760 (Okla. Crim. App. 2007). Pavatt v. State, No. PCD-2004-25 at 6 n.6 (Okla. Crim. App. Apr. 11, 2008). The OCCA also stated that this claim was "barred by *res judicata*." Id. at 6. Presumably, this was a reference to Pavatt's argument on direct appeal that the trial court erred in admitting gruesome photographs of Rob Andrew at the crime scene and his accompanying request that the OCCA review the premortem photographs of Rob Andrew. In any event, respondent does not argue that the claim is procedurally barred for purposes of federal habeas review.

The district court reviewed the claim on the merits and concluded that Pavatt had failed to demonstrate that the OCCA's decision was contrary to or an unreasonable application of Strickland v. Washington, 466 U.S. 668 (1984). ROA, Vol. 3 at 1125 (ECF No. 91 at 77). More specifically, the district court concluded "it [wa]s clear that based on the case cited by the OCCA in its denial of [Pavatt]'s claim, Marquez-Burrola, as well as other cases decided by the OCCA prior to [Pavatt]'s appeal, that [Pavatt] would not have prevailed on appeal had the claim been raised." Id. (citations omitted).

I agree with the district court. In Marquez-Burrola, the OCCA considered and rejected a challenge to the constitutionality of § 2403 of the Oklahoma Evidence Code, which states, in pertinent part, that "an appropriate photograph of the victim while alive shall be admissible evidence when offered by the district attorney to show the general

3

appearance and condition of the victim while alive." Okla. Stat. tit. 12, § 2403 2016); see Marquez-Burrola, 157 P.3d at 760. The OCCA in that case also rejected the defendant's argument that the trial court abused its discretion by admitting, pursuant to § 2403, a single, premortem photograph of the victim. Id. at 760-61. Notably, the premortem photograph of Rob Andrew was admitted at Pavatt's trial without objection pursuant to § 2403, and I see nothing about that photograph or the facts of Pavatt's trial that would distinguish it from Marquez-Burrola. Further, the OCCA itself explicitly stated that, in light of Marquez-Burrola, it would not have granted relief to Pavatt had he challenged the admission of Exhibit 219 on direct appeal. Consequently, Pavatt has failed to establish that he was prejudiced by the failure of his appellate counsel to raise the issue on direct appeal.

All of the remaining ineffective assistance claims asserted by Pavatt in this appeal—trial counsel's failure to prevent the admission of pervasive victim-impact evidence in both stages of trial (other than Exhibit 219), trial counsel's failure to investigate and present a compelling mitigation case, and appellate counsel's failure to assert these claims of ineffective assistance on direct appeal—were first presented by Pavatt to the OCCA in his second application for state post-conviction relief. The OCCA concluded that these claims were procedurally barred under the provisions of the Oklahoma Post-Conviction Procedure Act, Okla. Stat. tit. 22, §§ 1080 *et seq*. In reaching this conclusion, the OCCA noted that, under that Act, "[c]laims which could have been raised on direct appeal, but were not, are generally considered waived." Pavatt v. State,

4

No. PCD-2009-777 at 2 (Okla. Crim. App. Feb. 2, 2010). Further, the OCCA noted that it could "not consider the merits of any claim made in a subsequent application for post-conviction relief, unless (1) the legal basis for that claim was previously unavailable, or (2) the facts supporting the claim were not previously ascertainable through the exercise of reasonable diligence." Id. at 2-3. The OCCA determined that all of Pavatt's ineffective assistance claims could have been raised at an earlier time, and it in turn concluded that it was "barred by the provisions of the Post-Conviction Procedure Act from considering these arguments." Id. at 7.

Despite the OCCA's ruling, Pavatt argues that we should review his claims *de novo* for two reasons. First, he contends that "[t]he OCCA did not clearly impose a procedural bar of these claims, but instead stated the 'current arguments merely modify or expand the claims made, and rejected, in prior proceedings.'" Aplt. Br. at 50 (quoting Pavatt, No. PCD-2009-777 at 4). This argument makes little sense when one recalls that the ineffective assistance of counsel claims he now asserts were first raised in his second application for state post-conviction relief. Further, as discussed above and as Pavatt ultimately concedes in a related footnote, the OCCA quite clearly concluded that these claims were procedurally barred under Oklahoma's Post-Conviction Procedure Act. Id. at 50-51 n.14.

That leads to Pavatt's second argument: "Even if this Court determines the OCCA imposed a procedural bar, such a bar is not without exception. Post-conviction counsel's ineffectiveness in not fully challenging the failures of prior counsel to object to the

5

inadmissible sympathy evidence is the 'cause' that excuses any default." Id. at 50-51

(citations omitted). In other words, Pavatt argues that the ineffectiveness of the attorney

who represented him in filing his original application for post-conviction relief

establishes the "cause" for his failure to comply with Oklahoma's procedural

requirements.

In support of this argument, Pavatt relies on the Supreme Court's decisions in

Martinez v. Ryan, – U.S. –, 132 S. Ct. 1309 (2012) and Trevino v. Thaler, – U.S. –, 133

S. Ct. 1911 (2013). Aplt. Br. at 51. In Martinez, the Supreme Court held that if,

> under state law, claims of ineffective assistance of trial counsel *must* be
> raised in an initial-review collateral proceeding, a procedural default will
> not bar a federal habeas court from hearing a substantial claim of ineffective
> assistance at trial if, in the initial-review collateral proceeding, there was no
> counsel or counsel in that proceeding was ineffective.

Id. at 1320 (emphasis added).

In Trevino, the Supreme Court explained that, in determining whether the

Martinez exception to Coleman v. Thompson, 501 U.S. 722, 729-30, 753-54 (1991)

(holding that a defendant's state-law procedural default ordinarily prevents a federal

habeas court from considering the defendant's federal constitutional claim, and that an

attorney's errors in a post-conviction proceeding do not qualify as cause for such a

default), applies in a particular case, four requirements must be met:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial"
> claim; (2) the "cause" consisted of there being "no counsel" or only
> "ineffective" counsel during the state collateral review proceeding; (3) the
> state collateral review proceedings was the "initial" review proceeding in
> respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state
> law *requires* that an "ineffective assistance of trial counsel [claim] . . . be

6

raised in an initial-review collateral proceeding.

133 S. Ct. at 1918 (alteration in original) (quoting Martinez, 132 S. Ct. at 1318-19, 1320-21). The Court in Trevino ultimately extended the rule in Martinez to circumstances in which state law does not expressly require claims of ineffective assistance of trial counsel to be brought in collateral proceedings, but, by way of its "structure and design . . . make[s] it virtually impossible for an ineffective assistance claim to be presented on direct review." Id. at 1915 (internal quotation marks omitted).

Pavatt argues that the rules outlined in Martinez and Trevino should be applied in his case because (a) he was represented at trial and on direct appeal by the same attorney, (b) consequently, his original application for post-conviction relief was his first real opportunity to assert ineffective assistance of trial counsel claims, and (c) the attorney who represented him in filing his original application for post-conviction relief was ineffective for failing to raise these claims of ineffective assistance of trial counsel and appellate counsel.

I disagree. Martinez and Trevino are distinguishable because, in both of those cases, the Supreme Court focused on whether the "structure and design" of the state system at issue, i.e., what the Supreme Court in Trevino characterized as the state's "procedural regime," 133 S. Ct. at 1915, expressly or effectively prevented the petitioner from raising his or her ineffective assistance claim for the first time until state post-conviction proceedings. Notably, in Fairchild v. Trammell, 784 F.3d 702, 721 (10th Cir. 2015), we differentiated Oklahoma's procedural regime from the state systems that were

7

at issue in <u>Martinez</u> and <u>Trevino</u>. In particular, we noted that "Oklahoma provides a reasonable time to investigate a claim of ineffective assistance before raising it on direct appeal" and that, under Oklahoma law, "[a] claim of ineffective assistance can be raised with the opening brief on [direct] appeal."[1] <u>Id.</u> Thus, consistent with our holding in <u>Fairchild</u>, I would conclude that neither <u>Martinez</u> nor <u>Trevino</u> allow us to bypass the OCCA's procedural bar ruling and review Pavatt's ineffective assistance claims on the merits. To hold otherwise would be to adopt an entirely new, and potentially much broader, rule than was announced in <u>Martinez</u> and <u>Trevino</u>.

## II

As noted, Pavatt also asserts three distinct challenges to the HAC aggravating circumstance found by the jury: (1) that the jury in his case was not properly instructed regarding the HAC aggravating circumstance; (2) that the evidence presented at his sentencing proceeding was constitutionally insufficient to support the HAC aggravating circumstance; and (3) that the HAC aggravator, as applied by the Oklahoma Court of Criminal Appeals (OCCA), is unconstitutionally vague in violation of the Eighth Amendment. As discussed below, I conclude that all of these challenges lack merit, and that we must affirm the district court's denial of federal habeas relief with respect to those claims.

## A

---

[1] Indeed, we have recognized that Oklahoma law generally *requires* that a claim of ineffective assistance of trial counsel be raised on direct appeal. <u>See</u> <u>Cole v. Trammell</u>, 755 F.3d 1142, 1159 (10th Cir. 2014).

The Oklahoma legislature has outlined eight aggravating circumstances that may be found by a jury in the sentencing phase of a capital trial. See Okla. Stat. tit. 21, § 701.12. Included among those is the HAC aggravating circumstance. Id. § 701.12(4) ("The murder was especially heinous, atrocious, or cruel.").

In 1988, the Supreme Court addressed the constitutionality of Oklahoma's HAC aggravating circumstance in Maynard v. Cartwright, 486 U.S. 356 (1988). The claim in that case, which was filed by an Oklahoma capital defendant, was that Oklahoma's HAC aggravator was unconstitutionally vague and overbroad. The Supreme Court unanimously agreed and held that the statutory language of the HAC aggravator, standing alone, failed to give a jury adequate guidance. Id. at 363-64. "[A]n ordinary person," the Court concluded, "could honestly believe that every unjustified, intentional taking of human life is 'especially heinous.'" Id.

Notably, while Maynard was pending before the Supreme Court, the OCCA expressly "restricted the 'heinous, atrocious, or cruel' aggravating circumstance to those murders in which torture or serious physical abuse [wa]s present." Id. at 365 (citing Stouffer v. State, 742 P.2d 562 (Okla. Crim. App. 1987)). More specifically, the OCCA in Stouffer "identified two kinds of cases in which 'torture or serious physical abuse' [wa]s present: those characterized by the infliction of 'great physical anguish' and those characterized by the infliction of 'extreme mental cruelty.'" Medlock v. Ward, 200 F.3d 1314, 1324 (10th Cir. 2000) (Lucero, J., concurring). "In the mental cruelty context, the OCCA . . . emphasized that the torture required for finding the 'heinous, atrocious, or

9

cruel' aggravator must produce mental anguish in addition to that which of necessity accompanies the underlying killing." Id. (internal quotation marks omitted).  And, with respect to the physical anguish branch of its test, the OCCA held that, "[a]bsent evidence of conscious physical suffering by the victim prior to death, the required torture or serious physical abuse standard is not met."  Battenfield v. State, 816 P.2d 555, 565 (Okla. Crim. App. 1991).

In addition to the restrictions outlined in Stouffer, the OCCA has since indicated that the HAC aggravator "contemplates a two-step analysis."  Nuckols v. State, 805 P.2d 672, 674 (Okla. Crim. App. 1991).  The first step of this analysis, the OCCA has stated, requires the jury to determine whether the death of the victim was preceded by torture or serious physical abuse.  Id.  "Once this foundational assessment is made," the OCCA has stated, "then the jury may apply the definitions given to them . . . to measure whether or not the crime can be considered to have been heinous, atrocious or cruel."  Id.

In DeRosa v. State, 89 P.3d 1124, 1156 (Okla. Crim. App. 2004), the OCCA officially incorporated this two-step analysis into its uniform jury instructions.  More specifically, the OCCA outlined a jury instruction defining the HAC aggravator and directed that this instruction was to "replace the current version of OUJI-CR(2d) 4-73 and that it shall be used in all future capital murder trials in which the" HAC aggravator is alleged.  The instruction read as follows:

> The State has alleged that the murder was "especially heinous, atrocious, or cruel."  This aggravating circumstance is not established unless the State proves beyond a reasonable doubt:

10

> *First*, that the murder was preceded by either torture of the victim or serious physical abuse of the victim; and
>
> *Second*, that the facts and circumstances of this case establish that the murder was heinous, atrocious, or cruel.
>
> You are instructed that the term "torture" means the infliction of either great physical anguish or extreme mental cruelty. You are further instructed that you cannot find that "serious physical abuse" or "great physical anguish" occurred unless you also find that the victim experienced conscious physical suffering prior to his/her death.
>
> In addition, you are instructed that the term "heinous" means extremely wicked or shockingly evil; the term "atrocious" means outrageously wicked and vile; and the term "cruel" means pitiless, designed to inflict a high degree of pain, or utter indifference to or enjoyment of the suffering of others.

Id. The OCCA emphasized that "[t]his instruction does not change any of the legal requirements of the 'heinous, atrocious, or cruel' aggravating circumstance as it has existed up until this time." Id. "Rather," the OCCA noted, "it is intended to more fully inform the jury regarding the findings that must be made in order to properly apply the aggravator and to ensure that a jury determination is made regarding each of these findings." Id.

B

In the first of his challenges to the HAC aggravating circumstance found by the jury in his case, Pavatt contends that the state trial court's instructions to the jury regarding the HAC aggravating circumstance failed to inform them adequately that they must find "conscious physical suffering" before concluding that the murder was "especially heinous, atrocious, or cruel."

11

Prior to trial, Pavatt filed an objection "to the pattern verdict form, OUJI-CR 2d 4-84, on the grounds the special findings, i.e., the aggravating circumstances, [we]re ill-defined, vague and d[id] not check the unbridled discretion of the sentencer." State R. at 1286. Pavatt subsequently filed an objection to the standard instruction and verdict form on the HAC aggravating circumstance "on the grounds that [they were] unconstitutional" in light of the Supreme Court's decision in Maynard. Id. at 1471.

The state trial court overruled Pavatt's objections and, at the conclusion of the second-stage proceedings, gave the jury the following instruction regarding the HAC aggravating circumstance:

### Instruction Number 5

As used in these instructions, the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.

The phrase "especially heinous, atrocious, or cruel" is directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse.

Id. at 2052. The second-stage verdict form simply asked the jury to check whether or not they found the existence of each of the alleged aggravating circumstances. Id. at 2063. The verdict form did not otherwise explain or attempt to define the HAC aggravating circumstance. Id.

*Pavatt's presentation of the issue to the OCCA*

Although Pavatt argued on direct appeal that the evidence presented at trial was

insufficient to support the HAC aggravating circumstance, he did not challenge on direct appeal the adequacy of the HAC instruction or the verdict form. Nor did he raise the issue in his initial application for post-conviction relief. Instead, Pavatt waited until he filed his second application for post-conviction relief to raise the issue. In that application, Pavatt argued that the state trial court violated his constitutional rights by failing to provide an adequate instruction that informed the jury that it must find conscious physical suffering beyond a reasonable doubt before concluding that the murder was especially heinous, atrocious, or cruel.

*The OCCA's resolution of the claim*

In its opinion denying Pavatt's second application for post-conviction relief, the OCCA concluded that this claim was procedurally barred: "Because this argument is based on the trial record, it could have been made in prior proceedings, and may not be considered now." Pavatt, No. PCD-2009-777 at 5 (citing Okla. Stat. title 22, § 1089(D)(8)). In a related footnote, the OCCA also stated:

> In any event, we have rejected the same argument several times in the past. [Pavatt] essentially asks this Court to retroactively require an instruction that we promulgated — after Petitioner's conviction — in *DeRosa v. State*, 2004 OK CR 19, ¶¶ 91-97, 89 P.3d 1124, 1154-57. That instruction elaborates on the meaning of "heinous, atrocious, or cruel," and the relevant Uniform Jury Instruction already in existence (No. 4-73) was amended a year later. *DeRosa* was handed down several months after [Pavatt]'s trial. *DeRosa* does not hold that the Uniform Jury Instruction on this issue, being used at the time of DeRosa's and [Pavatt]'s trials, was materially deficient. *DeRosa*, 2004 OK CR 19, ¶ 97, 89 P.3d at 1156 ("This opinion should not be interpreted as a ruling that the former uniform instruction was legally inaccurate or inadequate"). This same attack on the pre-*DeRosa* version of OUJI-CR (2nd) No. 4-73 has been rejected several times by this Court. *Jackson v. State*, 2006 OK CR 45, ¶¶ 36-38, 146 P.3d 1149, 1161-63;

13

> *Browning v. State*, 2006 OK CR 8, ¶¶ 52-56, 134 P.3d 816, 843-45; *Rojem v. State*, 2006 OK CR 7, ¶¶ 68-73, 130 P.3d 287, 300-01.

Id. at 5 n.5.

### *The district court's procedural bar ruling*

The district court in this case concluded that Pavatt's challenge to the state trial court's HAC instruction was "barred from federal review." ROA, Vol. 3 at 1138. In support, the district court stated that "[t]he Tenth Circuit has repeatedly recognized the application of a procedural bar to claims which could have been raised in an initial post-conviction application but were not." Id. at 1079. The district court also concluded that "the OCCA's procedural bar here [wa]s adequate and independent." Id. at 1080. Lastly, the district court concluded that Pavatt had "not made any showing of cause and prejudice to excuse his default of th[is] claim[]," nor had he shown "that a fundamental miscarriage of justice w[ould] occur if the claim [wa]s not heard." Id. at 1081-82.

### *Pavatt's challenge to the district court's procedural bar ruling*

Pavatt now contends that "[t]he district court erred in finding this claim procedurally barred from federal review." Aplt. Br. at 41. In support, Pavatt asserts that "Valdez v. State, 46 P.3d 703 (Okla. Crim. App. 2002) gives the OCCA the option to permit consideration on the merits 'when an error complained of has resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right.'" Aplt. Br. at 41 (quoting Valdez, 46 P.3d at 710). "The merits inquiry," Pavatt asserts, "is thus part of the default consideration, and therefore, lacks independence as in Ake v. Oklahoma, 470 U.S. 68, 74-75 (1985)." Aplt. Br. at 41.

14

"The doctrine of procedural default prevents a federal court from reviewing 'the merits of a claim—including constitutional claims—that a state court declined to hear because the prisoner failed to abide by a state procedural rule.'" Williams v. Trammell, 782 F.3d 1184, 1212 (10th Cir. 2015) (quoting Martinez v. Ryan, 566 U.S. 1, 9 (2012)). "In order to bar federal review, a state procedural rule must be adequate to support the judgment and independent from federal law." Banks v. Workman, 692 F.3d 1133, 1145 (10th Cir. 2012). "These dual requirements seek to ensure state rules are not employed to defeat federal court review of constitutional rights." Id. "To satisfy the adequacy element, a state procedural rule must be strictly or regularly followed and applied evenhandedly to all similar claims." Id. (internal quotation marks omitted) (citation omitted). This court "ha[s] repeatedly held that Oklahoma's procedural default rule meets the adequacy requirement." Id. "A state procedural rule is independent if it relies on state law, rather than federal law, as the basis for the decision." Id. (internal quotation marks omitted) (citation omitted).

"In Ake v. Oklahoma, . . . the OCCA had held that [defendant] Ake had waived his claims that he was entitled to a court-appointed psychiatrist to assist him in an insanity defense because he had not renewed his request for a psychiatrist in a new-trial motion." Black v. Workman, 682 F.3d 880, 918 (10th Cir. 2012). "But under Oklahoma law there was no procedural bar if the alleged error was 'fundamental trial error'; and federal constitutional error was considered an error of that type." Id. (quoting Ake, 470 U.S. at 74-75). "Thus, the OCCA could not apply the waiver rule without first addressing the

15

federal constitutional error." Id. "The Supreme Court concluded that the state waiver

rule was therefore not an independent state ground for barring review." Id.

In Pavatt's case, as in Banks, the OCCA based its denial "upon the state procedural

rule in § 1089(D)(8)." 692 F.3d at 1145. "Because § 1089 is purely a state law rule, we

have held that Oklahoma decisions resting entirely upon § 1089(D)(8) are independent."

Id. But Pavatt, relying on Valdez and parroting other Oklahoma capital defendants who

have mounted similar challenges, essentially argues that the OCCA's reliance on §

1089(D)(8) "does not preclude merits review because the state bar is not independent of

federal law." Fairchild, 784 F.3d at 719. More specifically, Pavatt "is asserting that the

OCCA will not impose a procedural bar [pursuant to § 1089(D)(8)] unless it first

determines that any federal claims lack merit," id., and thus the OCCA "sometimes

forgives noncompliance with the bar on successive post-conviction applications."

Williams, 782 F.3d at 1213.

As we have noted, however, "the Valdez exception only applies in cases involving

an exceptional circumstance, and it is insufficient to overcome Oklahoma's regular and

consistent application of its procedural-bar rule in the vast majority of cases."[2] Id.

(internal quotation marks omitted) (citations omitted). In this case, Pavatt's challenge to

the HAC jury instruction is far from exceptional: it is a claim that was readily apparent

---

[2] "Valdez was special because the lawyers there knew that their client was a citizen of Mexico and nonetheless failed to comply with the Vienna Convention when they failed to contact the Mexican Consulate, thereby depriving the Consulate [of] the ability to intervene and present its discovery that the defendant suffered from organic brain damage." Williams, 782 F.3d at 1213.

16

from the trial record and that could and arguably should have been raised on direct appeal. Moreover, although the OCCA opined in a footnote that there was no merit to Pavatt's claim, the clear and unequivocal basis for its denial of his claim was procedural bar under § 1089(D)(8). See Cole, 755 F.3d at 1158-59 (acknowledging and applying the OCCA's procedural bar ruling, even though the OCCA, on an alternative basis, briefly addressed and rejected the merits of the petitioner's claim); Thacker v. Workman, 678 F.3d 820, 834 n.5 (10th Cir. 2012) (same). I therefore agree with the district court that the claim is procedurally barred.

*The merits of Pavatt's claim*

Even if we were to assume that the claim was not procedurally barred, it cannot provide Pavatt with a valid basis for federal habeas relief. In Workman v. Mullin, 342 F.3d 1100 (10th Cir. 2003) and Wilson v. Sirmons, 536 F.3d 1064 (10th Cir. 2008), we considered HAC jury instructions identical to the one utilized in Pavatt's case and rejected claims identical to the one now asserted by Pavatt. In doing so, we concluded that the language of the instructions was sufficient to narrow the jury's discretion, as required by Supreme Court precedent. Workman, 342 F.3d at 1116; Wilson, 536 F.3d at 1108. We also noted in Wilson that "[e]ven if the jury instruction did not sufficiently narrow the jury's discretion," the OCCA could "also perform this narrowing function on review" and actually did so. 536 F.3d at 1108. The same holds true in Pavatt's case.

C

In the second of his challenges to the HAC aggravating circumstance, Pavatt

17

argues that the evidence presented at the sentencing phase of his trial was constitutionally insufficient to support the HAC aggravating circumstance. In support of his challenge to the constitutional sufficiency of the evidence supporting the HAC aggravator, Pavatt offers his view of the evidence:

> Rob Andrew was shot twice with a shotgun at relatively close range. There was no gratuitous violence. There was no torture. There was no anguish or suffering beyond that which necessarily accompanied the underlying killing. The two shotgun blasts were both independently fatal. Pellets from both shots hit vital internal organs. Rob could not have remained conscious for more than a few moments, before going into shock and quickly bleeding to death. Additionally, the combination of both shots would have sped up the bleeding, causing Rob to die where he fell. If Rob Andrew's homicide was "heinous, atrocious, or cruel," then any murder in which the victim does not die instantly satisfies this factor.

Aplt. Br. at 21-22.

*Pavatt's presentation of the claim to the OCCA*

Pavatt first challenged the sufficiency of the evidence supporting the HAC aggravator in his direct appeal. The entirety of his argument was as follows:

> There was insufficient evidence to support the heinous, atrocious or cruel aggravating circumstance. See Thomas v. Gibson, 218 F.3d 1213 (10th Cir. 2000)(Evidence was insufficient to support heinous, atrocious or cruel aggravating circumstance); Donaldson v. State, 722 So.2d 177 (Fla. 1998); Jones v. Gibson, 206 F.3d 946, 953 (10th Cir. 2001)("We agree with petitioner and the federal district court that the record does not support the Oklahoma Court of Criminal Appeals' finding that the victim pleaded for his life").

> The evidence does not support the fact that the murder was "especially" heinous, atrocious or cruel. As defense counsel said during closing argument, "To some degree I suppose all homicides are heinous, atrocious or cruel. I think that's the reason why the legislature has inflicted the term especially to that phrase."

18

Interestingly, the State attempts to prove the existence of the aggravating circumstance on the basis of the information provided by Brenda Andrew in her 911 call to the police. (Tr. 3763) The medical examiner's testimony was that either of the two wounds could have been fatal. Death occurred in a matter of minutes. The medical examiner could not tell how long Mr. Andrew was conscious. (Tr. 3764)

Direct Appeal Br. at 47.

The OCCA rejected this claim on the merits, stating as follows:

In Propositions 14 and 15, Appellant challenges the sufficiency of the evidence to support the two aggravating circumstances alleged by the State as warranting the death penalty. Such challenges are reviewed under the same standard as challenges to the evidence supporting a criminal conviction. We consider the evidence in a light most favorable to the State, and determine whether any rational juror could have found the existence of the challenged aggravating circumstance beyond a reasonable doubt. DeRosa, 2004 OK CR 19 at ¶ 85, 89 P.3d at 1153; Lockett v. State, 2002 OK CR 30, ¶ 39, 53 P.3d 418, 430.

In Proposition 14, Appellant claims the evidence was insufficient to support the jury's finding that the murder of Rob Andrew was "especially heinous, atrocious, or cruel." To establish this aggravator, the State must present evidence from which the jury could find that the victim's death was preceded by either serious physical abuse or torture. Evidence that the victim was conscious and aware of the attack supports a finding of torture. Davis v. State, 2004 OK CR 36, ¶ 39, 103 P.3d 70, 81; Black v. State, 2001 OK CR 5, ¶ 79, 21 P.3d 1047, 1074 (evidence that victim consciously suffered pain during and after stabbing was sufficient to support this aggravating circumstance); Le, 1997 OK CR 55 at ¶ 35, 947 P.2d at 550; Romano v. State, 1995 OK CR 74, ¶ 70, 909 P.2d 92, 118; Berget v. State, 1991 OK CR 121, ¶ 31, 824 P.2d 364, 373. Our evaluation is not a mechanistic exercise. As we stated in Robinson v. State, 1995 OK CR 25, ¶ 36, 900 P.2d 389, 401:

As much as we would like to point to specific, uniform criteria, applicable to all murder cases, which would make the application of the "heinous, atrocious or cruel" aggravator a mechanical procedure, that is simply not possible. Rather, the examination of the facts of each and every case is necessary in determining whether the aggravator was proved.

19

Unfortunately, no two cases present identical fact scenarios for our consideration, therefore the particulars of each case become the focus of our inquiry, as opposed to one case's similarity to another, in resolving a sufficiency of the evidence claim supporting the heinous, atrocious or cruel aggravator.

The evidence presented at trial showed that Rob Andrew suffered numerous wounds resulting from two shotgun blasts, which damaged his internal organs. The medical examiner testified that either wound would have caused sufficient blood loss to be independently fatal, but that death was not instantaneous. When emergency personnel arrived, Andrew was still clutching a trash bag full of empty aluminum cans, which reasonably suggested that he either tried to ward off his attacker or shield himself from being shot. Brenda Andrew called 911 twice after the shooting; together, the two calls spanned several minutes. During the second call, she claimed that her husband was still conscious and attempting to talk to her as he lay bleeding to death on the garage floor. All of these facts tend to show that Rob Andrew suffered serious physical abuse, and was conscious of the fatal attack for several minutes. See Ledbetter v. State, 1997 OK CR 5, ¶ 53, 933 P.2d 880, 896 (evidence that murder victim was likely aware that she was about to be assaulted because defendant had attempted to kill her one week earlier, that she tried to defend herself from the fatal attack, and that she attempted to communicate with a neighbor after the attack was sufficient to show that the murder was especially heinous, atrocious or cruel).

After finding that the murder was accompanied by torture or serious physical abuse, the jury may also consider the attitude of the killer and the pitiless nature of the crime. Lott, 2004 OK CR 27 at ¶ 172, 98 P.3d at 358; Phillips v. State, 1999 OK CR 38, ¶ 80, 989 P.2d 1017, 1039. That the victim was acquainted with his killers is a fact relevant to whether the murder was especially heinous, atrocious, or cruel. In finding the murder in Boutwell v. State, 1983 OK CR 17, ¶ 40, 659 P.2d 322, 329 to be especially heinous, atrocious, or cruel, this Court observed:

> In this case the killing was merciless. The robbers planned well in advance to take the victim's life. Even more abhorrent and indicative of cold pitilessness is the fact that the appellant and the victim knew each other.

We find the situation in the present case even more pitiless. Rob

20

Andrew correctly suspected his wife of having an affair with a man he trusted as his insurance agent. He correctly suspected his wife and her lover of trying to wrest control of his life insurance away from him. He correctly suspected his wife and her lover of attempting to kill him several weeks before by severing the brake lines on his car. He confided in others that he was in fear of his life. Having separated from his wife, Rob Andrew was murdered as he returned to the family home to pick up his children for the Thanksgiving holiday. From the evidence, a rational juror could have concluded, beyond a reasonable doubt, that Rob Andrew had time to reflect on this cruel state of affairs before he died. The evidence supported this aggravating circumstance, and this proposition is denied.

Pavatt v. State of Oklahoma (Pavatt I), 159 P.3d 272, 294-95 (Okla. Crim. App. 2007)

(internal paragraph numbers omitted).

*Standard of review*

Because Pavatt's challenge to the sufficiency of evidence supporting the HAC

aggravator was previously addressed and rejected on the merits by the OCCA, our scope

of review is circumscribed by 28 U.S.C. § 2254(d). See Montgomery v. Louisiana, —

U.S. —, 136 S. Ct. 718, 740 (2016) ("federal court[s] ha[ve] no inherent habeas corpus

power, but only that which is conferred (and limited) by statute."); Harrington v. Richter,

562 U.S. 86, 92 (2011). Section 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

21

28 U.S.C. § 2254(d).

*Clearly established federal law applicable to the claim*

In determining whether Pavatt is entitled to federal habeas relief under § 2254(d)(1), we must identify the "clearly established Federal law" that applies to Pavatt's claim. As the majority correctly notes, aggravating factors in a capital case, such as the HAC aggravator found by the jury in Pavatt's case, "operate as 'the functional equivalent of an element of a greater offense.'" Ring v. Arizona, 536 U.S. 584, 609 (2002) (quoting Apprendi v. New Jersey, 530 U.S. 466, 494 (2000)). Consequently, due process requires that the evidence presented at trial be sufficient to support an aggravator. Jackson v. Virginia, 443 U.S. 307, 319 (1979). In assessing a sufficiency-of-evidence challenge to an aggravator, "the relevant question [therefore] is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (emphasis in original).

*Merits of the claim*

The majority opinion does not directly address this claim. It does, however, seem to concede that "a reasonable juror could have found" the State's evidence "to be sufficient evidence of conscious physical suffering." Maj. Op. at 24. With this I would agree. And, in any event, I conclude, for the reasons outlined below, that the OCCA's resolution of the claim was neither contrary to nor an unreasonable application of clearly established federal law.

In challenging the OCCA's decision, Pavatt begins by offering his own summary

22

of the relevant evidence, arguing that the crime at issue resulted in "[a] shotgun death" that involved "no conscious suffering beyond what accompanies any murder." Aplt. Br. at 21. According to Pavatt, "[t]here was no gratuitous violence," "no torture," and "no anguish or suffering beyond that which necessarily accompanied the underlying killing." Id. Further, Pavatt argues that "[t]he two shotgun blasts were both independently fatal" and Rob Andrew "could not have remained conscious for more than a few moments, before going into shock and quickly bleeding to death." Id. at 21-22. In sum, Pavatt argues, "[i]f Rob Andrew's homicide was 'heinous, atrocious or cruel,' then any murder in which the victim does not die instantly satisfies this factor." Id. at 22.

The problem with Pavatt's description of the evidence is that it wholly ignores the standard of review mandated by the Supreme Court in Jackson. As we have noted, Jackson requires a reviewing court to "view[] the evidence in the light most favorable to the prosecution." 443 U.S. at 319. When that standard is applied to the evidence presented in Pavatt's case, it simply does not support his description of the relevant facts. Although it is true that each of the shotgun blasts were independently lethal, Pavatt is simply incorrect in asserting that Rob Andrew "could not have remained conscious for more than a few moments." Aplt. Br. at 21. Indeed, the medical examiner who testified on behalf of the prosecution conceded it was possible that Rob Andrew remained conscious for several minutes after sustaining the wounds. And that testimony, combined with Brenda Andrew's statements to the 911 operator regarding Rob Andrew's condition (which we will discuss in greater detail below), would have allowed the jury to

23

reasonably find that he indeed remained conscious far longer than "a few moments."

Pavatt also argues that the OCCA "relied on irrelevant speculation about what Rob [Andrew] was feeling." Aplt. Br. at 24. In support, Pavatt examines and attempts to discredit each of the factors cited by the OCCA in support of its determination. To begin with, Pavatt asserts that "[t]he 'numerous wounds' referred to by the OCCA were caused by pellets from the same shotgun, shot at nearly the same time." Id. at 32. Although Pavatt is correct on this point, that does not prove the OCCA's determination to be wrong. Indeed, the medical examiner testified at trial that the two shotgun blasts damaged Rob Andrew's right lung, aorta, and liver. In addition, the photographs of Rob Andrew's body quite clearly indicate that the shotgun pellets caused numerous, separate entry and exit wounds on his body. And, although Pavatt asserts that these wounds "did not contribute to an inordinate amount of conscious pain prior to death," id. at 30, the medical examiner testified to the contrary, noting the wounds would, indeed, have been painful.

Pavatt in turn argues that, contrary to the OCCA's determination, "the quick loss of blood from both wounds resulted in shock and loss of consciousness within one minute." Id. But this argument ignores, and is ultimately contrary to, the testimony of the medical examiner. The medical examiner testified that, as a result of the blood loss associated with the wounds, Rob Andrew would have lost consciousness before he actually died. The medical examiner declined on direct examination to give an exact amount of time that Rob Andrew remained conscious after sustaining the wounds. On

24

cross-examination, the medical examiner agreed that it was possible that Rob Andrew died less than one minute after sustaining the wounds, but he also testified that Rob Andrew "probably" would have lost consciousness within five minutes. Tr. at 2462. And, on redirect, the medical examiner testified it was possible that Rob Andrew remained conscious for more than one minute after sustaining the wounds. Ultimately, the medical examiner's testimony, construed in the light most favorable to the prosecution, would have allowed the jury to find that Rob Andrew remained conscious for several minutes after sustaining the wounds.

Pavatt argues that the fact that Rob Andrew was found "clutching the plastic trash bag was meaningless in determining whether [he] consciously suffered and thus, it was unreasonable for the OCCA to speculate about why [he] may have been holding the bag." Aplt. Br. at 30. I disagree. It is unknown whether Rob Andrew was holding the trash bag prior to being ambushed, or whether, instead, he was able to pick up the bag and attempt to fend off his attacker after sustaining one or both shotgun blasts. Because the OCCA was obligated to view the evidence in the light most favorable to the prosecution, it was entirely reasonable for it to draw the latter inference. And that inference was relevant to the OCCA's assessment of the sufficiency of the evidence supporting the HAC aggravator because it would have supported a finding that Rob Andrew remained conscious, and indeed mobile, after one or both shotgun blasts.

Pavatt also complains that it was unreasonable for the OCCA "to conclude that Rob consciously suffered based on Brenda's statements in her 911 calls, when everything

25

she said in those calls was determined to be false." Id. The fallacy of this argument, however, is the notion that all of Brenda's statements to the 911 operator were proven to be false. The fact of the matter is that at least some of Brenda's statements during the two 911 calls were obviously true. For example, it is undisputed that she was physically present with Rob Andrew after he suffered the two shotgun blasts and during at least the second 911 call. Further, her statements to the 911 operator that she and Rob Andrew had been shot were indisputably true. Likewise, some of her statements describing what she was witnessing, such as the arrival of police officers to her house, were also quite clearly true (indeed, officers' voices can be heard in the background during the second 911 call at the precise time that Brenda tells the 911 operator that the police have arrived on the scene). Thus, the jury, having listened to recordings of both 911 calls, was left to decide whether her statements to the 911 operator regarding Rob's condition, including her statement that he was conscious and attempting to talk to her, and her repeated statements that he was breathing, were credible or not. Although the jury was not bound to give credence to those statements, it was certainly within the jury's province to do so. See Perry v. New Hampshire, 132 S. Ct. 716, 732 (2012) (noting it is "the jury's task [to] assess[] witness credibility and reliability"). Consequently, I conclude it was in turn reasonable for the OCCA, applying the standard of review mandated by Jackson, to treat as credible Brenda's statements regarding Rob Andrew's condition in assessing the sufficiency of the evidence to support the HAC aggravator.

Finally, Pavatt argues that no "deference [should be] afforded [the jury's verdict]

26

under <u>Jackson</u>" because "[t]here were no conflicting facts about how Rob [Andrew] died." Aplt. Br. at 22. I disagree. <u>Jackson</u> provides, in relevant part, that "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." at 326. That is precisely the situation we have here. As we have already explained, the evidence presented at Pavatt's trial most certainly "supports conflicting inferences" regarding how long Rob Andrew remained conscious after sustaining the two shotgun blasts. We therefore presume that the jury in Pavatt's trial, having found the existence of the HAC aggravator, resolved these conflicts in favor of the prosecution. And, in turn, we, like the OCCA, must defer to that resolution.

In sum, I conclude that Pavatt has failed to establish that the OCCA's determination that the evidence was sufficient to support the HAC aggravator was contrary to, or involved an unreasonable application of, clearly established federal law. Thus, Pavatt is not entitled to federal habeas relief on this claim.

D

In his third and final challenge, Pavatt argues that the HAC aggravating circumstance, as applied in his case, is unconstitutionally vague in violation of the Eighth Amendment. The majority agrees with Pavatt and indeed grants him federal habeas relief on the basis of this claim. In doing so, however, the majority ignores the fact that the claim is both procedurally barred and not properly before this court. Moreover, even

27

ignoring these procedural problems, the majority's analysis ignores the fact that the jury's finding of the HAC aggravator in Pavatt's case is entirely consistent with the body of OCCA case law that has tailored and applied the HAC aggravating circumstance in a manner that avoids the arbitrary and capricious infliction of the death penalty. Consequently, Pavatt is not entitled to federal habeas relief on the basis of this claim.

*Pavatt's failure to present the claim to the OCCA*

In his second application for state post-conviction relief, Pavatt argued to the OCCA that the HAC aggravating circumstance was facially vague, in violation of the Eighth and Fourteenth Amendments (i.e., a facial challenge to the HAC aggravating circumstance). The OCCA declined to review the merits of that claim, noting that the claim could have been raised in Pavatt's first application for state post-conviction relief.

At no point has Pavatt ever argued to the OCCA that the HAC aggravating circumstance, as applied in his case, is unconstitutionally vague in violation of the Eighth and Fourteenth Amendments (an as-applied challenge). Consequently, the OCCA has never had an opportunity to address that claim. And, were Pavatt to attempt to present the claim now to the OCCA, by way of a belated application for state post-conviction relief, the OCCA would presumably treat it as untimely and procedurally barred. Thus, the claim has been procedurally defaulted for purposes of federal habeas review. See Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991) ("This rule [allowing a federal habeas court's consideration of fairly presented federal claims] does not apply if the petitioner failed to exhaust state remedies and the court to which the petitioner would be

28

required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred. In such a case there is a procedural default for purposes of federal habeas . . . ."); Cole v. Trammell, 755 F.3d 1142, 1169 (10th Cir. 2014) ("Cole has never presented this argument to the Oklahoma state courts and it is therefore unexhausted and subject to an anticipatory procedural bar.").

*Pavatt's federal habeas petition*

In his federal habeas petition, Pavatt reasserted his facial challenge to the HAC aggravating circumstance. More specifically, in Ground Thirteen of his petition, Pavatt argued that the Eighth and Fourteenth Amendments were violated by Oklahoma's continued use of what he described as "the facially vague aggravating circumstance that a murder is: especially heinous, atrocious, or cruel." Dist. Ct. Docket No. 42 at 172 (capitalization omitted).

And, for the first time ever, Pavatt hinted at the possibility of an as-applied challenge to the HAC aggravating circumstance, but did not directly assert that as an independent ground for federal habeas relief. In Ground Ten of his petition, Pavatt argued, as he had on direct appeal, that the evidence presented at trial was constitutionally insufficient to allow the jury to find the existence of the HAC aggravating circumstance. As part of his Ground Ten arguments, Pavatt asserted for the first time ever that his sentence "did not comport with the Eighth and Fourteenth Amendments," id. at 147, and he compared the facts of his case to other Oklahoma capital cases that purportedly involved victims who survived for a brief time after being injured. Id. at 150-51, 154-55.

29

The district court concluded that Ground Thirteen–Pavatt's facial challenge to the HAC aggravating circumstance–was "barred from federal review" because the OCCA had declined to review it due to Pavatt's failure to raise it in a timely fashion. Dist. Ct. Docket No. 91 at 90. As for Ground Ten, both the respondent and the district court understandably treated it as alleging only an insufficiency-of-evidence claim and not an as-applied vagueness challenge to the HAC aggravating circumstance. See Dist. Ct. Docket No. 69 at 128 ("In Ground Ten, Petitioner alleges that insufficient evidence was presented at trial to support the jury's finding of the especially heinous, atrocious or cruel aggravator."); Dist. Ct. Docket No. 91 at 80 ("In Ground Ten, Petitioner challenges the sufficiency of the evidence supporting the jury's finding that Rob's murder was especially heinous, atrocious, or cruel."). Because Pavatt had raised an insufficiency-of-evidence challenge on direct appeal, the respondent conceded that the claim was "exhausted for purposes of federal habeas review," Dist. Ct. Docket No. 69 at 128, and the district court agreed. Dist. Ct. Docket No. 91 at 81-82. Ultimately, the district court rejected Pavatt's insufficiency-of-evidence claim, applying the deferential standard of review outlined in § 2254(d). Id. at 83-84 ("Based on the presented evidence, and with acute awareness of the double deference applied by the Court in the resolution of this claim, the Court finds that Petitioner has not shown that this decision by the OCCA is contrary to or an unreasonable application of Supreme Court law.").

*Pavatt's appeal to this court*

30

Although the district court denied Pavatt a COA, this court, in a November 24, 2014 case management order, granted Pavatt a COA as to four claims, including (1) the question of "[w]hether there was sufficient evidence to support the 'especially heinous, atrocious, or cruel' aggravator (raised in Ground 10 of [his] habeas petition)," and (2) "whether the trial court's failure to provide an adequate instruction to the jury that it must find 'conscious physical suffering' beyond a reasonable doubt before finding that the murder was 'especially heinous, atrocious, or cruel' violated . . . Pavatt's constitutional rights to a fair trial, a reliable sentencing determination, and due process (raised in Ground 11 of [his] habeas petition)." Case Mgmt. Order at 1-2. Notably, the case management order made no mention of Pavatt's as-applied or facial vagueness challenges to the HAC aggravating circumstance. Thus, those arguments are not properly before this court.

Nevertheless, Pavatt, in what amounts to either ignorance or defiance of the case management order, filed appellate pleadings inserting as-applied vagueness arguments into his discussion of his insufficiency-of-evidence claim.

*The majority opinion*

Remarkably, the majority opinion ignores all of these procedural problems and ultimately grants Pavatt federal habeas relief on the basis of his as-applied vagueness arguments. I disagree with this approach and would reject Pavatt's as-applied arguments as (1) not properly before this court because no COA was granted on those arguments, and (2) subject to an anticipatory procedural bar due to Pavatt's failure to present them to

31

the OCCA.

The majority opinion also, curiously, purports to apply the deferential AEDPA standards to Pavatt's as-applied arguments, even though it is quite clear that those arguments were never presented to or addressed by the OCCA. Indeed, the majority opinion takes the OCCA to task for failing to "apply[] or even consider[] controlling Supreme Court precedent," and in turn concludes that the OCCA's "decision [was] contrary to clearly established federal law." Maj. Op. at 29. But that begs the question of what OCCA decision the majority opinion is referring to?

*The merits of Pavatt's as-applied arguments*

Even if I were to ignore the serious procedural defects described above and reach the merits of Pavatt's as-applied challenge to the HAC aggravating circumstance, I would reach a different conclusion than the majority.

OCCA case law, which the majority all but ignores, identifies at least two categories of murders that the HAC aggravator does not apply to, and both are distinguishable from the murder committed by Pavatt. The first category of murders are those in which the victim dies instantaneously or nearly so. A perfect case in point is Simpson v. State, 230 P.3d 888 (Okla. Crim. App. 2010). The defendant in that case shot and killed two victims who were traveling inside of a car. The first victim, who was driving the car at the time of the shooting, "was shot four times," including "a grazing gunshot wound to the right shoulder, two superficial gunshot wounds to the left side of his back, and an ultimately fatal gunshot wound to his chest." Id. at 902. "Although [this

32

victim] was initially conscious after being shot, his breathing became labored and he made gurgling sounds as his chest filled with blood before he died." Id. at 902-03. "There was [also] testimony that immediately after he had been shot, [this victim] was able to speak, was aware that he had been shot and was fearful that the shooters would return." Id. at 903. "Reviewing th[is] evidence in the light most favorable to the State," the OCCA concluded "that the evidence support[ed]" the jury's "finding that [this victim's] death was preceded by physical suffering and mental cruelty." Id. "With regard to the murder of [the second victim, who was the front seat passenger], the evidence showed that his death was nearly immediate." Id. In particular, he "suffered numerous gunshot wounds including wounds to his head and chest" and "[t]he Medical Examiner testified that [his] injuries were not survivable and he likely died within seconds after being shot." Id. Notably, the OCCA concluded that this "evidence d[id] not show, beyond a reasonable doubt and in a light most favorable to the State, that [the second victim's] death was preceded by torture or that he endured conscious physical suffering before dying." Id. In short, the OCCA in Simpson drew a distinction between murders in which the victim's death is instantaneous and murders in which the victim experiences conscious physical suffering for some period of time after being wounded.

Notably, Simpson is but one of many cases in which the OCCA has refused to allow application of the HAC aggravating circumstance where a murder victim's death was instantaneous or nearly so. Indeed, Pavatt cites to numerous such cases in his opening appellate brief (I cite these cases in the same order they are listed in that brief).

33

See Brown v. State, 753 P.2d 908, 912 (Okla. Crim. App. 1988) (victim was shot seven times, including once in the aorta and once in the heart; no evidence was presented indicating that victim was conscious after one or more of the shots); Davis v. State, 888 P.2d 1018, 1021 (Okla. Crim. App. 1995) ("No testimony indicated that the victims who died were conscious or suffered pain at any time."); Sellers v. State, 809 P.2d 676, 690 (Okla. Crim. App. 1991) (no evidence that any of the three victims were conscious or suffered after being shot by the defendant); Booker v. State, 851 P.2d 544, 548 (Okla. Crim. App. 1991) (concluding that testimony of medical examiner, regarding victim who was shot in the chest with a shotgun, was "as consistent with instantaneous death as any other possibility"); Marquez v. State, 890 P.2d 980, 987 (Okla. Crim. App. 1995) (noting that the victim "was shot approximately three times while asleep," "[t]he injuries caused by two of the shots could have been fatal," and one of those shots "would have caused death nearly instantaneously."); Cheney v. State, 909 P.2d 74, 80 (Okla. Crim. App. 1995) (striking HAC aggravator where the shooting at issue lasted only seconds and some of the wounds would have rendered the victim immediately unconscious); Myers v. State, 133 P.3d 312, 332 (Okla. Crim. App. 2006) ("The evidence does not prove [the victim] was conscious and aware of her attack or that she was conscious and alive suffering pain after the attack."); Crawford v. State, 840 P.2d 627, 641 (Okla. Crim. App. 1992) ("No testimony was elicited by either the State or the defense as to the level of suffering by the decedent," and "no evidence was presented to show that the decedent did not die instantly as a result of the strangulation."); Battenfield, 816 P.2d at 565 (assistant medical

34

examiner testified "that the type of blow to the victim's head would generally cause loss of consciousness immediately.").

The second, and undeniably more limited, category of murders that the OCCA has indicated do not warrant application of the HAC aggravator are those in which death is not instantaneous, but where the victim, though conscious for some period of time, does not experience severe physical suffering. This category is exemplified by Cudjo v. State, 925 P.2d 895 (Okla. Crim. App. 1996). The murder victim in that case was shot a single time in the back of the head. Although the victim "was aware he had been injured, he was not sure what type of wound he had received (i.e. gun shot wound or blow to the head)." Id. at 901. "Moreover, the gravity of [the victim's] injury was not apparent to others at the [crime] scene." Id. For example, one police officer testified that the victim "was coherent and making sense." Id. Another police officer testified that the victim indicated "he was all right." Id. At worst, the evidence indicated that the victim "experienced nausea, vomiting and shortness of breath and complained about his head hurting." Id. Ultimately, after being taken to a local hospital, the victim "became unresponsive and . . . later died." Id. The defendant in Cudjo argued on direct appeal that this evidence was insufficient to support the jury's finding of the HAC aggravating circumstance. The OCCA agreed, noting that while the victim "did experience some conscious physical or mental suffering prior to his death, the evidence fail[ed] to demonstrate that the murder was preceded by torture or serious physical abuse." Id.

Pavatt's case does not fit within, and is reasonably distinguishable from, these two

35

categories of cases. Comparing Pavatt's case to <u>Simpson</u>, it is readily apparent that Rob Andrew's situation was most similar to that of the first victim in <u>Simpson</u>, who remained conscious after being shot and experienced severe physical suffering, and was distinguishable from that of the second victim in <u>Simpson</u>, who died almost instantaneously after being shot. Pavatt's case is also distinguishable from <u>Cudjo</u> for the simple reason that the evidence in Pavatt's case would have allowed the jury to find that Rob Andrew, unlike the victim in <u>Cudjo</u>, experienced significant pain for a period of time before dying. Thus, contrary to what the majority may say, Pavatt's case can be distinguished in a "principled way" from numerous Oklahoma cases in which the OCCA has held that the HAC aggravating circumstance cannot be applied.

III

One final matter deserves mention. The majority opinion cryptically "reverse[s] the denial of [federal habeas] relief with respect to [Pavatt's] sentence and remand[s] to the district court for further proceedings." Maj. Op. at 2. The majority opinion also notes that "[t]he jury . . . found the remuneration aggravator" and that "[t]he parties have not presented arguments on what effect that has on the disposition of this case." <u>Id.</u> at 13 n.3. In my view, it is unclear what these statements are intended to mean for the district court and the parties. Moreover, I submit that the only remedy that the district court may impose in light of the Sixth Amendment is to order the State of Oklahoma to provide Pavatt with a new sentence proceeding within a reasonable time. Cf. <u>Hooks v. Workman</u>, 689 F.3d 1148, 1208 (10th Cir. 2012) ("We therefore grant the writ with respect to Mr.

36

Hooks's sentence, *subject to the condition* that the State of Oklahoma resentence him within a reasonable time.").

Oklahoma law outlines three possible sentencing options for a person convicted of murder in the first degree: death, imprisonment for life without parole, or imprisonment for life. Okla. Stat. tit. 21, § 701.9(A). Where, as here, the State seeks imposition of the death penalty, Oklahoma law requires the trial court to "conduct a separate sentencing proceeding" before a jury.[3] Id. § 701.10(A). At this separate sentencing proceeding, "evidence may be presented as to any mitigating circumstances or as to any of the [statutory] aggravating circumstances." Id. § 701.10(C). In order for the jury at the separate sentencing proceeding to recommend a sentence of death, Oklahoma law requires the jury to make two related findings of fact. First, the jury must unanimously find beyond a reasonable doubt the existence of one or more of the statutory aggravating circumstances. Id. § 701.11. Second, the jury must then unanimously find that any such aggravating circumstance(s) outweigh the mitigating circumstances alleged by the defendant. Id.

Oklahoma's capital sentencing scheme in turn requires the OCCA to review every sentence of death that is imposed and determine, in pertinent part, whether the evidence supports each of the statutory aggravating circumstances found by the jury. Id. §

---

[3] The separate sentencing proceeding is typically held before the same jury that found the defendant guilty of murder in the first degree. Okla. Stat. tit. 21, § 701.10(A). But where error is determined to have occurred in the original capital sentencing proceeding, the state trial court is authorized "to impanel a new sentencing jury who shall determine the sentence of the defendant." Id. § 701.10a(1)(b).

37

701.13(C)(2).  The OCCA is expressly authorized by statute to "[a]ffirm the sentence of death" or to "[s]et the sentence aside and remand the case for resentencing by the trial court."  Id. § 701.13(E).  The statute also appears to imply that the OCCA can "correct[]" any errors in the sentence.  Id.  And, indeed, the OCCA has at times done just that by engaging in its own reweighing after invalidating an aggravating circumstance.  E.g., Moore v. State, 809 P.2d 63, 65-66 (Okla. Crim. App. 1991).

Historically, the Supreme Court has allowed for such independent reweighing by state appellate courts.  See Richmond v. Lewis, 506 U.S. 40, 49 (1992) ("Where the death sentence has been infected by a vague or otherwise constitutionally invalid aggravating factor, the state appellate court or some other state sentencer must actually perform a new sentencing calculus, if the sentence is to stand."); Clemons v. Mississippi, 494 U.S. 738 (1990) ("We see no reason to believe that careful appellate reweighing of aggravating against mitigating circumstances in cases such as this would not produce 'measured consistent application' of the death penalty or in any way be unfair to the defendant.").

But that precedent appears to be of questionable validity in light of the Supreme Court's recent decision in Hurst v. Florida, – U.S. –, 136 S. Ct. 616 (2016).  At issue in Hurst was the constitutionality of Florida's capital sentencing scheme.  Under that scheme, a capital defendant could be sentenced to death "only if an additional sentencing proceeding 'result[ed] in findings by the court that such person shall be punished by death.'"  Id. at 617 (quoting Fla. Stat. § 775.082(1)).  More specifically, the trial judge had to "independently find and weigh the aggravating and mitigating circumstances

38

before entering a sentence of life or death." Id. The Supreme Court "h[e]ld this sentencing scheme unconstitutional." Id. at 619. In doing so, the Court explained that "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." Id.; see also Ring, 536 U.S. at 589 ("Capital defendants, no less than noncapital defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment.").

To be sure, the Supreme Court has not yet revisited the issue of appellate reweighing since issuing Hurst. But the implications of Hurst seem clear. Appellate reweighing, at least under a capital sentencing scheme like the one at issue in Oklahoma, requires an appellate court to make a new and critical finding of fact, i.e., whether the remaining valid aggravating circumstances outweigh any mitigating circumstances alleged by the defendant. In light of Hurst, it appears clear that such a factual finding can be made only by a jury. All of which leaves only one option in this case: grant the writ subject to the State of Oklahoma affording Pavatt with a new sentencing proceeding.[4]

IV

Because I conclude that all of the issues asserted by Pavatt in this appeal lack merit, I would affirm the district court's denial of Pavatt's petition for writ of habeas corpus.

---

[4] By determining that the evidence presented at Pavatt's sentencing proceeding was insufficient to support the jury's finding of the HAC aggravating circumstance, the majority's decision in this case necessarily invalidates not only that aggravating circumstance, but also the jury's ultimate, and inextricably intertwined finding that the aggravating circumstances that it found outweighed the mitigating circumstances alleged by Pavatt.